PEOPLE v JOHNSON

Docket No. 107224. Argued March 11, 1999 (Calendar No. 1). Decided
    July 20, 1999.

Jermell D. Johnson was convicted in the Livingston Circuit Court,
    Daniel A. Burress, J., of first-degree murder. The Court of Appeals,
    MARILYN KELLY, P.J., and NEFF and STEMPIEN, JJ., affirmed in an
    unpublished opinion per curiam (Docket No. 178466). The defend-
    ant seeks leave to appeal, limited to the question whether the trial
    court erred in denying the defendant's motion for a directed
    verdict.

In an opinion per curiam, signed by Chief Justice WEAVER, and
    Justices BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, the Supreme Court
    held:

The prosecution introduced sufficient evidence to withstand the
    defendant's motion for a directed verdict.

When determining whether sufficient evidence has been
    presented to sustain a conviction, a court must view the evidence
    in a light most favorable to the prosecution and determine whether
    any rational trier of fact could have found that the essential ele-
    ments of the crime were proven beyond a reasonable doubt. In this
    case, ample evidence was introduced that the defendant committed
    the murder, and that it was premeditated.

Affirmed.

Justice CAVANAGH, dissenting, stated that while recognizing that a
    reviewing court must consider not whether there was any evidence
    to support the conviction, but whether there was sufficient evi-
    dence to justify a rational trier of fact in finding guilt beyond a rea-
    sonable doubt, the majority, nonetheless, sustains the defendant's
    conviction on thin circumstantial evidence, while at the same time
    downplaying powerfully exculpatory evidence weighing in the
    defendant's favor.

The inquiry in this case is not whether there was any evidence to
    sustain a verdict; rather, the inquiry is whether there was sufficient
    evidence to justify a rational trier of fact in finding guilt beyond a
    reasonable doubt. In context, the facts of this case, could not per-
    suade a rational juror of guilt beyond a reasonable doubt. The pros-

ecution presented no direct evidence implicating defendant in the crime.

A reviewing court should look at all the evidence against a defendant in a given case to determine if that evidence is sufficient for a rational juror to convict beyond a reasonable doubt. While the reviewing court must examine the evidence in the light most favorable to the prosecution, that does not mean that it must ignore exculpatory evidence weighing in the defendant's favor. In this case, however, by limiting the issue on appeal, the Supreme Court leaves out an important piece of the puzzle.

Justice KELLY took no part in the decision of this case.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David L. Morse*, Prosecuting Attorney, and *Daniel J. Garber, Jr.*, Assistant Prosecuting Attorney, for the people.

*Carolyn A. Blanchard* for defendant-appellant.

PER CURIAM. The defendant was convicted of first-degree murder and sentenced to life in prison. The Court of Appeals affirmed. We granted leave to appeal to decide whether the circuit court erred when it denied the defendant's motion for directed verdict. Like the Court of Appeals, we affirm.

I

About 7:00 P.M. on an April evening in 1993, a social worker named Barbara Synnestvedt was murdered in the staff lounge at the Green Oak Center, part of the W.J. Maxey Training School in southern Livingston County.

The victim had been strangled by hand. Abrasions on her body suggested that a struggle had taken place. Her belt had been removed and lay near her. Her trousers had been pulled up taut in front, and were down somewhat in back.

Almost immediately, suspicion fell on defendant Jermell D. Johnson, a resident of Green Oak. He was seen in the vicinity of the lounge about the time of the killing, and had been asking about the victim earlier in the day.

The prosecuting attorney brought an open charge of murder against the defendant. MCL 750.316; MSA 28.548. At the close of the prosecutor's proofs, defense counsel moved unsuccessfully for a directed verdict. The defendant then testified, denying that he had committed the murder. However, the jury found him guilty as charged.

After the Court of Appeals affirmed,[1] this Court granted leave to appeal, "limited to the question whether the trial court erred in denying the defendant's motion for a directed verdict."[2]

II

In *People v Wolfe*, 440 Mich 508, 513-516; 489 NW2d 748 (1992),[3] we reviewed the standard for deciding an issue of this sort:

In determining whether the prosecution has presented sufficient evidence to sustain a conviction, an appellate court is required to apply the standard adopted by this Court in *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), cert den 449 US 885 (1980). There, we stated

---

[1] Unpublished opinion per curiam, issued July 19, 1996 (Docket No. 178466).

[2] Initially, leave to appeal was denied because this Court was equally divided, there being no majority in favor of granting leave to appeal. 455 Mich 867 (1997). Later, this Court granted reconsideration and leave to appeal. 457 Mich 871 (1998). After leave was granted, this Court denied the prosecuting attorney's motion to affirm. Unpublished order entered January 26, 1999 (Docket No. 107224).

[3] Opinion amended 441 Mich 1201 (1992).

that a reviewing court "must consider not whether there was any evidence to support the conviction but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt."

This standard was articulated by the United States Supreme Court in *Jackson v Virginia*, 443 US 307; 99 S Ct 2781; 61 L Ed 2d 560 (1979), and has been applied regularly in the courts of this state. See *Hampton, supra,* 407 Mich 366; *People v Petrella,* 424 Mich 221, 268; 380 NW2d 11 (1985); *People v Lewis,* 178 Mich App 464, 468; 44 NW2d 194 (1989). The sufficient evidence requirement is a part of every criminal defendant's due process rights. It is an attempt to give "concrete substance" to those rights, by precluding irrational jury verdicts. *Jackson, supra,* 443 US 315. [440 Mich 513-514.]

Observing that "when an appellate court reviews the evidence supporting a conviction, factual conflicts are to be viewed in a light favorable to the prosecution," 440 Mich 515, we concluded:

In short, when determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Hampton, supra,* 407 Mich 368; *Petrella, supra,* 424 Mich 268. [440 Mich 515-516.]

III

The first of several staff members who testified was the person in charge of the Green Oak Center on April 25, 1993. He explained that Ms. Synnestvedt was a social worker assigned to E Wing,[4] and that the defendant lived on D Wing. When Ms. Synnestvedt

---

[4] The residents of Green Oak lived in six wings of twenty beds each.

had not checked out by 8:00 P.M., the staff member began to look for her. He and a fellow employee went to the staff lounge, where the other employee had last seen her. There, they found her body against a wall. There was "quite a bit" of blood on the walls and on a nearby copy machine.

The staff member had seen the defendant about 8:00 P.M., then saw him again shortly after the body was found. He told the defendant to go back to his housing wing. He did not notice anything unusual about the defendant's appearance or behavior.

A second staff member testified that she saw the victim working in the lounge at about 7:10 or 7:15 P.M. Another testified that he walked past the staff lounge about 7:00 P.M. and saw a purse on a table in the lounge. The lights were out. The same was true several moments later, when he looked again. He checked the door of the lounge, and found it to be locked.

Another Green Oak employee testified that he supervised the kitchen detail, which included the defendant.[5] The workers were throwing out trash and moving supplies in the loading area. At one point, Ms. Synnestvedt came into that area and said "Hi." She left about 6:40 P.M. This employee and the detail went back to the kitchen and got snacks. The defendant then left with two other residents.

A Green Oak employee who worked on the defendant's wing testified that the defendant returned from the kitchen detail between 7:00 and 7:15 P.M. Later that evening, he noticed that the defendant had some

___

[5] The defendant was one of several residents assigned to "detail," a group involved in meal and custodial service for the center.

scratches on his right arm. The defendant said that he got them when taking the garbage out. The defendant left to do another detail assignment at about 7:40 P.M.

After the Green Oak staff members testified, a forensic pathologist opined that the victim had died of manual strangulation.

Several residents of Green Oak testified, in addition to the defendant. The first said that he worked on detail with the defendant that day. They left the kitchen area about 6:50 P.M., and he saw the defendant coming down the stairs near the gym on his way back to his wing.

A second resident testified that, at about 4:30 P.M., the defendant asked him if he had seen Ms. Synnestvedt. This resident and five to seven others played basketball in the gym from 6:00 P.M. until 8:00 P.M.

The detail assignment of a third resident was buffing floors. He saw the defendant about 6:00 P.M. in the administrative area. The defendant asked which hallway he intended to buff first. This resident thought the lights in the staff lounge were on; he did not see Ms. Synnestvedt.

A fourth resident testified that he lived on the same wing as the defendant. He related that the defendant came to the door of the classroom where the wing's residents were watching television at 7:35 or 7:40 P.M. The defendant said that he was going to take a shower, a staff member approved the request, and the defendant left. A very short time later, this witness saw the defendant sweating "[a] whole lot." The defendant then told staff that he had to clean another area, and left. The defendant came back and obtained some bleach from the staff. The defendant had a red mark or a small cut on the side of his face.

Other residents also testified. One said that he went by the staff lounge at 5:30 or 6:00 P.M. The light was on then, but at 7:00 P.M. it was off. Another testified that he went past the staff lounge three times that evening. He saw the victim sitting and writing in the staff lounge with the light on the first two times. The light was off and he did not see her the last time.

Still another resident (who also lived in the same wing as the defendant) went from his wing upstairs to G Wing to buy candy for a staff member at about 6:35 or 6:40 P.M. He had to go up and down the stairs twice in a matter of minutes. On his second trip back to his wing, he saw the defendant walking quickly away from the gym area. The defendant was wearing a red shirt, a white apron, and black pants. The defendant told him that he was coming from the gym. The defendant had blood below his left eye.

The defendant told this witness not to go in the direction the witness was headed, because the floors were being buffed. This statement may have been an attempt to steer the witness away from the area where the crime was committed. The defendant also asked the witness whether the latter would take Kool-Aid back to the wing for him. The witness said that he would. They went to the kitchen, and the defendant got the Kool-Aid. The defendant disappeared for a few seconds. When he came back with the Kool-Aid, he was not wearing the apron. However, he was wearing disposable gloves. The witness went back downstairs toward his wing, and the defendant asked him whether the staff member in charge of Green Oak was there. The witness got back to his wing at about 7:00 P.M.

There also were police witnesses, including three detectives. One detective testified that he interviewed the defendant later that night after being called to the scene. He observed scratches on both the defendant's arms. He identified a plastic bag found in the kitchen area that contained an apron and some paper towels, which smelled of bleach.

The detective had been told by one resident that he went by the staff lounge at 7:10 P.M. At that time, the lights were on, the door was locked, and he did not see the victim. Another resident told the detective that the defendant had appeared on his wing and asked whether he could take a shower at 7:20 P.M.

A second detective testified that two palm prints found atop a cabinet in the room where the victim was found matched the defendant's palm prints. Two other palm prints were found on the front of the cabinet in the same room, and these matched defendant's prints. The palm prints were oriented so that the fingers were pointing up. This orientation incriminates defendant, because it suggests that defendant was on the floor, or parallel to it. This position is inconsistent with typical innocent activities, such as opening and closing cabinet doors, which are normally done from a standing position, but it is consistent with an attack on a victim who is lying prone. Six palm prints that were found on the same cabinet did not match those of the defendant or of the victim. These prints were not compared to the known prints of anyone else.

The third detective interviewed the defendant in the early morning hours of April 26, the day after the murder. The defendant recounted his activities that day. The detective observed eight or ten scratches on the defendant's arms, but no injuries to, or blood on,

his face. The scratches looked fresh. He searched the defendant's room for clothes and found a red T-shirt and black jeans that were wet and smelled of bleach. The defendant denied ever having been in the part of the staff lounge in which the victim's body was found.

This detective also testified that, during the interview, the defendant said that he had spoken with the victim near the end of his detail, when he and the others were taking out the garbage. According to the defendant, the victim came out to the loading dock and the defendant asked her if she were going home, to which she replied that she wished that she were. The defendant said that was the only contact with the victim that he could recall.

Testimony was taken from several civilian evidence specialists employed by the State Police. One said that she compared hairs found on the victim's body and the defendant's clothes with known hairs. Hairs found in the victim's hand appeared to be her own. Head hairs and a pubic hair from a Caucasian person found on the defendant's clothes were not from the victim.

Another of the evidence specialists detected red/maroon fibers on a broom found in the kitchen dock area that could have been from a sweatshirt worn by the victim. Maroon fibers found on the defendant's jeans were dissimilar and could not have come from the sweatshirt. Partial shoe prints on cellophane found underneath the victim's body and on her belt shared "class" characteristics with the defendant's state-issued shoes. Only class characteristics matched; no individual characteristics (matching or nonmatching) were found. The defendant's were

the only state-issued shoes compared to the impressions.

The head of the microchemical unit of the State Police crime laboratory tested spots on a red T-shirt seized from the defendant's room for blood type. Blood on the shirt could not have been the defendant's, but could have been the victim's. The same was true of two blood spots on jeans found in the defendant's room. Blood on the clothing of the victim could not have been defendant's, but could have been hers.

This employee's expert opinion was that sperm and semen found in the vagina of the victim did not come from the defendant. Neither was the victim's husband (who had had a vasectomy) the source of the sperm. However, the employee acknowledged the possibility that either man could have been the source.[6]

After hearing these proofs, the circuit court denied the defendant's motion for a directed verdict on murder and premeditated murder.

The defendant testified that he had been at Green Oak for two and a half years. He was being considered for release on August 5, 1993. He had "off-limits" status, which meant that he was sometimes allowed to leave the grounds. He was on paid work detail, which did the cleaning and maintenance for the whole center.

---

[6] The employee's opinion was based on tests relating to a particular enzyme. However, the passage of time and a change in body chemistry of the decedent could have caused the breakdown of the enzyme.

The dissent notes the prosecution did not advance the theory that the enzyme broke down or that defendant committed a sexual assault. The jury, however, was free to interpret the evidence differently than the prosecution. Moreover, even if defendant was not the source of the semen, the jury may have rationally concluded that defendant committed the crime with one or more co-felons.

The defendant said that he had last been in the staff lounge about five weeks before the victim's death. He delivered coffee to the lounge and put it in the area where the victim's body was found. At about the same time, he came in to straighten the books and shelves in the same area, but did not touch the counter. He said that he told a detective that he had not been in the back room of the staff lounge on the day of the killing, but said he was never asked whether he had *ever* been in there. The defendant said that his arm cuts came from work and from playing basketball. He denied killing the victim and said that he did not know who did.

IV

The Court of Appeals denied relief to the defendant, explaining:

Defendant argues that there was insufficient evidence of premeditation to support the first-degree murder charge. Although the evidence against defendant was not overwhelming, it was sufficient to allow a rational trier of fact to find that the prosecutor had proved the essential elements of first-degree premeditated murder beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), modified 441 Mich 1201 (1992). The victim was manually strangled and had defensive wounds on her body, indicating a struggle, which would have provided defendant some opportunity for reflection. *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). In addition, defendant apparently formed the plan to gain entry to the lounge to attempt a sexual assault. Forming such a plan required forethought. There was evidence that he was looking for the victim before the killing, another indicator of premeditation. The body was found in the back room of the staff lounge, meaning defendant had to first pass through the front room before the murder, allowing him time for

reflection. Defendant's post-killing conduct also inferred [sic] premeditation to some degree. *Id.*

V

The defendant's motion for directed verdict had two elements. He argued that there was insufficient evidence that he committed the crime. Alternatively, he insisted that there was no evidence of the premeditation that would raise the offense to first-degree murder. However, we are satisfied that the prosecution introduced sufficient evidence to withstand both aspects of the motion.[7]

---

[7] The dissent essentially inverts the standard for reviewing sufficiency claims by focusing on exculpatory evidence rather than viewing the evidence in the light most favorable to the prosecution. The dissent states that "the most significant physical evidence indicated that defendant was *not* the assailant." *Post*, p 735. The dissent is apparently referring to the expert's opinion that defendant was not the source of the semen. As discussed, the jury could have rationally viewed this evidence as being consistent with defendant's guilt. The dissent also notes that, in addition to defendant's palm print, other hand- and fingerprints not matching defendant's were found at the crime scene. This evidence was for the jury to consider and did not preclude the jury from rationally finding defendant guilty.

[A]ppellate courts are not juries, and even when reviewing the sufficiency of the evidence they must not interfere with the jury's role:

"[An appellate court] must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. . . . Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony." [*Wolfe, supra,* pp 514-515 quoting *People v Palmer,* 392 Mich 370, 375-376; 220 NW2d 393 (1974).]

Juries, not appellate courts, are responsible for weighing evidence. *Id.,* p 515.

The dissent further states that "the prosecutor's case was entirely circumstantial." *Post,* p 737. Surely the dissent does not mean to suggest that no defendant may be convicted of murder in the absence of direct eyewit-

First, there is ample evidence that the defendant committed the murder. He had asked about the victim earlier in the day, and had approached her to learn whether she was leaving for the day. Several witnesses saw him in the vicinity of the staff lounge where the killing took place. While working on detail, the defendant used a broom of the type that later was found on the loading dock with fibers from the victim's clothing. The defendant denied being in the part of the lounge where the victim's body was found, yet his palm prints were discovered nearby. Also found in the vicinity were footprints similar to his shoes. Blood samples matching that of the victim were found on the defendant's clothing even after he evidently had attempted to destroy that evidence with bleach. Apparently the victim had struggled with her assailant, and the defendant was seen around the time of the killing with fresh cuts on his arms and sweating profusely.

Second, the prosecution did introduce evidence on the basis of which the jury properly could find that the murder was premeditated. The defendant had known the victim previously, as the result of her position as a social worker at Green Oak. He inquired about her on the afternoon of the killing, and later asked her directly whether she was leaving for the day. And, as noted earlier, several witnesses saw him

---

ness testimony. "Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime." *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999).

Finally, the dissent complains about the police investigation, noting that "defendant was apparently the only focus" of the investigation. *Post*, p 736. Our role here, however, is to determine whether the prosecution adduced sufficient evidence of defendant's guilt, not to second-guess the police investigation.

near the staff lounge where the victim was working. He inquired which hall would be buffed first, and he may have sought to divert one of the residents from using the hall outside the lounge (which would have made it easier to commit the crime unobserved).

The circumstances of the crime itself are also significant. Though neither the brutal nature of a killing nor manual strangulation alone is sufficient to show premeditation, the prosecutor is correct that evidence of manual strangulation can be used as evidence that a defendant had an opportunity to take a "second look." *People v Furman*, 158 Mich App 302, 308; 404 NW2d 246 (1987). The prosecutor is likewise correct that defensive wounds suffered by a victim can be evidence of premeditation. *People v Anderson, supra* at 538. Both the defendant and victim had injuries that suggested a struggle.

Significantly, the record also suggests that the defendant moved the victim to a more secluded area. She was seen by several witnesses in the front room of the staff lounge, where a number of her belongings were later found. However, her body was found on the floor in the back room of the lounge. From these facts, the jury properly could infer that before the killing the defendant moved the victim to a place where persons passing in the hallway could not see what was taking place. Again, the prosecutor correctly identifies this as evidence that can be indicative of premeditation. *People v Irby*, 129 Mich App 306, 323; 342 NW2d 303 (1983).

For these reasons, we agree with the Court of Appeals that the prosecution introduced sufficient evidence, and that the circuit court properly denied the defendant's motion for directed verdict. Accord-

ingly, we affirm the judgments of the Court of Appeals and the circuit court.

WEAVER, C.J., and BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, JJ., concurred.

CAVANAGH, J. (*dissenting*). While I agree with the majority's recitation of the standard of review for determining whether the prosecution has presented sufficient evidence to sustain a conviction, I cannot agree with its application of that standard to the facts of this case. In particular, the majority recognizes that "a reviewing court 'must consider not whether there was any evidence to support the conviction but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt.'" *Ante* at 723, quoting *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992). While paying lip service to this standard, the majority sustains defendant's conviction on thin circumstantial evidence, while at the same time downplaying powerfully exculpatory evidence weighing in defendant's favor. Because I believe the majority's analysis is untenable, I respectfully dissent.

Certainly, there is some evidence in the record that points to defendant as the perpetrator. Defendant was seen near the scene of the crime, had scratches on his arms, a cut above his eye, and was sweating profusely. He also inquired about the victim's presence and possible departure, asked a co-worker what hall he would buff first, and perhaps tried to steer another youth away from the crime scene. Finally, his palm prints were found at the scene of the crime and blood samples matching the victim's blood type were

found on his clothes (despite the fact that the clothes were soaked in bleach).

However, the inquiry in this case is not whether there was *any* evidence to sustain a verdict; rather, the inquiry is whether "there was sufficient evidence to justify a rational trier of fact in finding guilt *beyond a reasonable doubt.*" *Id.* (emphasis added). In the context of this case, I do not believe these facts can persuade a rational juror of guilt beyond a reasonable doubt. The prosecution presented no direct evidence implicating defendant in the crime.[1] Indeed, the most significant physical evidence indicated that defendant was *not* the assailant. The victim was found with her belt off and her pants positioned in a manner suggesting a sexual assault, yet semen taken from the victim's body did not come from the defendant or the victim's husband.[2] Also significant is the fact that the victim died in a room that locked automatically (meaning that she let her assailant in, or that he had a key), and that there were other hand- and fingerprints in the area that did not match those of the defendant. Moreover, the murder took place in a facility that

---

[1] While the prosecution did produce some evidence indicating that defendant had blood on his clothes, that evidence only indicated broad possibilities that the blood was actually that of the victim.

[2] The majority takes some solace in the prosecution's expert testimony acknowledging "the possibility that either man could have been the source [of the sperm]." *Ante* at 729. While the expert witness did testify that it was *possible* that the victim's body chemistry had broken down the particular enzyme that would link the sperm to defendant, she clearly did not believe that such a breakdown had actually occurred in this case. Thus, the only expert testimony that the jury heard regarding the sperm was that it did not belong to this defendant. It is inconceivable how any rational juror could conclude, on the basis of this testimony, that defendant was actually the source of the semen found in the decedent *beyond a reasonable doubt.* Indeed, even the prosecutor did not bother to advance such a theory of the case. Rather, he argued that the death was a result of an attempted, but unsuccessful, sexual assault.

housed over one hundred boys plus staff in close quarters. However, defendant was apparently the only focus of the police investigation.

Given this evidence weighing in defendant's favor, I also find it regrettable that the Court, in granting leave to appeal in this case, limited its consideration to whether there was sufficient evidence to sustain defendant's conviction. In his application for leave to appeal, defendant argued that the trial court erred in excluding testimony from a co-worker that the decedent had told her that she feared being "set up" by other staff members to get hurt and that she feared for her safety because of certain actions of residents of the facility.[3] He argued that the statements were admissible under MRE 803(3),[4] the state of mind exception to the hearsay rule, because they were relevant to whether the decedent would have opened the locked door for a resident of the facility.

The evidence of the victim's state of mind on the very day of the murder showing that she was concerned that the staff might be setting her up to get hurt, that she was fearful and wanted to leave her job, and that she felt that she could become a target of the youths who had confided in her because they could turn on her, all was material to the defendant's

---

[3] The defendant was not one of the persons she told her co-worker that she feared.

[4] MRE 803(3) provides:

> *Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of a declarant's will.

theory that someone else, either a staff member or a resident, was the killer. It was also relevant to refute the prosecution's theory that the defendant was the only one the evidence showed had the opportunity to kill the victim because it suggested that if she was afraid of the residents, she would not have opened the door to one of them.[5]

Given the thinness of the prosecution's proofs without this evidence, I think the additional testimony of the decedent's co-worker casts further doubt on defendant's guilt. I believe a reviewing court should look at *all* the evidence against a defendant in a given case to determine if that evidence is sufficient for a rational juror to convict him beyond a reasonable doubt. While the reviewing court must look at the evidence in the light most favorable to the prosecution, that does not mean that it must ignore exculpatory evidence weighing in the defendant's favor. Here, however, by limiting the issue on appeal, the Court leaves out an important piece of the puzzle.

In sum, I agree with the majority that there is some evidence that points to defendant's guilt. Even so, the prosecutor's case was entirely circumstantial, and the threads of proof are quite thin. Moreover, there is also significant exculpatory evidence weighing in defendant's favor. Thus, I believe that even a rational juror who suspected that defendant was guilty would at least be required to confess a reasonable doubt. Therefore, I would reverse defendant's conviction.

KELLY, J., took no part in the decision of this case.

---

[5] Indeed, the excluded evidence tends to suggest that the assailant was either somebody the victim was comfortable with or somebody who possessed a key to the room, such as a staff member.