*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RALPH BOWLING III,

        Defendant-Appellant.

UNPUBLISHED
December 22, 2020

No.  348553
Barry Circuit Court
LC No.  2017-000603-FC

Before:  RONAYNE KRAUSE, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Defendant, Ralph Bowling III, appeals as of right his jury trial convictions of first-degree premediated and felony murder, MCL 750.316; four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; assault with intent to commit murder, MCL 750.83; first-degree home invasion, MCL 750.110a(2); second-degree arson, MCL 50.73(1); and carrying a weapon with unlawful intent, MCL 750.226.  Defendant argues that insufficient evidence was admitted to support his conviction for premeditated first degree murder and/or felony murder.  We disagree and affirm his convictions.

## I. PERTINENT FACTS

This case arises out of the murder of the victim, defendant's wife.  In the months leading up to the victim's murder, defendant frequently fought with the victim.  It was clear that their marriage was failing.  Defendant became increasingly suspicious that the victim was "cheating" on him, and was especially concerned about her having an "affair" with NF.  NF worked with both the victim and defendant.  After rumors started at work that NF and the victim were more than friends, defendant installed a trail camera in the bedroom closet he shared with the victim.  He also installed an application on the victim's cell phone that allowed him to track the victim's location and view the victim's text messages.  After the victim discovered the trail camera in the closet on a Wednesday morning, the victim left defendant and took their child with her.  The victim moved in with her mother, MW, and her mother's husband, TW.

That Wednesday, the victim texted defendant and told him where she was staying.  She also told him to stay away from her.  MW also texted defendant to let him know that their usual

-1-

Wednesday-night family dinner was canceled. That weekend, MW and TW went up North with the victim's child and left the victim alone at their home. The victim spent Saturday evening hanging out with NF. They went to Lansing and then ended the night at MW and TW's home (hereinafter "the property"). Defendant followed them around the entire night and also ended up at the same location. Defendant spied on the victim and NF from outside the home. He saw them cuddling on the couch together, the victim's legs draped over NF. At that moment, defendant decided to confront them. He walked back to his truck, took off, and returned to the home approximately an hour later with a single-shot .410 shotgun and a bag of ammunition.

When defendant returned, he came in through the back door. The victim asked defendant why he was there and demanded that he leave. Defendant then shot NF in the face, and NF ran out of the house for help. There was then a struggle between defendant and the victim, and the gun went off a second time. The victim then left the house, and defendant followed. The gun then went off a third and final time, killing the victim. Afterward, defendant fled the property and drove to his residence. He lit his house on fire and contemplated suicide before changing his mind. He then escaped his house, ditched his gun in a field, abandoned his truck, and called his mother, who picked him up and turned him into the police. Defendant was then charged, convicted, and sentenced. Defendant now appeals.

## II. STANDARD OF REVIEW

We review de novo challenges to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We must review the challenge "in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime to have been proved beyond a reasonable doubt." *Id*.

## III. ANALYSIS

MCL 750.316(1)(a) defines first-degree premediated murder as "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." The Michigan Supreme Court established that first-degree premediated murder requires the prosecution to prove each of the following elements beyond a reasonable doubt: "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). "[W]hen considering a sufficiency-of-the-evidence issue, [t]he question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Id*. at 242 (quotation marks and citation omitted; second alteration in original). "Premeditation and deliberation are legislative offspring and are to be construed in the light of the statutory scheme." *Id*. at 240 (quotation marks and citation omitted). Although the Legislature did not define the terms premeditation and deliberation, the Michigan Supreme Court "recognized the ordinary meaning of the distinct and separate terms as the following: [t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id*. (quotation marks and citation omitted; alteration in the original).

The prosecution may prove premeditation and deliberation by showing "an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Oros*, 502 Mich at 242 (citation

omitted). This means that "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation." *Id*. (quotation marks and citation omitted). However, "it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Id*. There is no minimum amount of time required between the initial intent and the ultimate action, and "[i]t is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds.' " *Id*. at 242-243 (quotation marks and citation omitted; alteration in original).

Additionally, "[t]he requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Oros*, 502 Mich at 243 (quotation marks and citation omitted).

> In other words, what constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict. [*Id*. at 243-244.]

"For example, in *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999), evidence of a struggle between the defendant and the victim can be evidence of premeditation and deliberation based on the defendant's opportunity to take a 'second look.' " *Oros*, 502 Mich at 244. Additionally, "a defendant's attempt to conceal the killing can be used as evidence of premeditation." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003). Furthermore, "the prior relationship of the parties" and "the defendant's actions before the killing" may be used as evidence of premeditation. *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995).

In this case, the jury had more than sufficient evidence upon which it could draw the reasonable inference that defendant acted with premeditation and deliberation. Defendant's relationship with the victim provided the jury with evidence that the killing of the victim was premeditated. See *id*. The evidence at trial indicated that right before defendant left the first time, he saw the victim on the couch cuddling with NF. Defendant testified that he saw them next to each other and saw the victim kissing NF's hand. NF also confirmed that he was on the couch with the victim and that the victim had her legs over him. This occurred after months of conflict between the victim and defendant with defendant accusing the victim of cheating and after the victim told defendant that she was leaving him. Defendant testified that he was heartbroken when he saw them that close together on the couch. He also testified that he "felt [his] life was coming, falling apart." He then started walking back toward his truck. Defendant testified that at that point, he realized that he "had two options." He could either confront them in the home or go home, and he did not feel like going home.

Defendant's actions before the murder also indicated that he acted with premeditation and deliberation. See *id*. The record evidence confirms that defendant had a sufficient amount of time to take a "second look." See *Oros*, 502 Mich at 242. Defendant testified that he decided to confront NF and the victim when he left, after he had been stalking and spying on them, and the record indicates that he did not return for approximately one hour. Defendant had to walk half a mile to his truck, which was on the corner of Foster and Maple Grove Road. One of the neighbors, testified that he saw defendant's vehicle leave the corner of Foster and Maple Grove Road at

approximately 12:34 a.m. At approximately 1:20 a.m., Deputy Thomas Heald of the Barry County Sheriff's Office testified that he saw defendant's truck on a road six miles from the property. Additionally, at about that same time, the neighbor testified that he saw defendant's pickup truck return to the corner of Foster and Maple Grove Road. Defendant then grabbed his gun and the bag of shotgun shells from his truck and walked back the half-mile to the property. During this time, defendant also had time to take a "second look" at his actions. See *id*.

Additionally, the record indicates that when defendant entered the home, he first targeted and shot NF and the fired his gun a second time inside the home. This means that sometime after defendant shot NF, because he was using a single-shot .410 shotgun, he manually reloaded the shotgun and manually cocked the hammer. During that time, defendant had time to take a "second look." See *id*. The record also indicates that the gun fired a second time while defendant and the victim struggled with the gun, so during that time, defendant once again had time to take a "second look." See *Johnson*, 460 Mich at 733. Additionally, because defendant fired his gun a third and final time killing the victim, the record indicates that defendant had to stop to manually reload the shotgun and manually cock the hammer after it fired the second time. During that time, defendant also had time to take a "second look." See *Oros*, 502 Mich at 242.

Furthermore, defendant's actions after the murder provided the jury with evidence that the killing of the victim was premeditated because he tried to conceal what he did after he shot the victim. See *Gonzalez*, 468 Mich at 641. Defendant testified that after he shot the victim, he fled the scene. He did not contact the police. He did not attempt to help the victim. He returned to his home where he attempted to kill himself and burn down his home.

> It is well established in Michigan law that evidence of flight is admissible. . . . Such evidence is probative because it may indicate consciousness of guilt. . . . The term "flight" has been applied to such actions as fleeing the scene of the crime. . . . *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (citations omitted).

Suicide is certainly about as far as a person may get in terms of fleeing the scene. Additionally, after defendant changed his mind about suicide, he threw his gun in a field and abandoned his truck in another field. Therefore, there was sufficient evidence in the record to establish first-degree premeditated murder.

Defendant also argues that there was insufficient evidence to support his first-degree felony murder conviction. We disagree.

> The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). [*People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).]

MCL 750.316(1)(b) provides the following enumerated offenses:

> arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking

and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n, torture under section 85, aggravated stalking under section 411i, or unlawful imprisonment under section 349b.

The murder need not "be contemporaneous with the enumerated felony." *People v Kelly*, 231 Mich App 627, 643; 588 NW2d 480 (1998). "The statute requires only that the defendant intended to commit the underlying felony at the time the homicide occurred." *Id*.

First-degree home invasion, which is an enumerated felony found in MCL 750.316(1)(b), "can be committed in several different ways" and "involves alternative elements necessary to complete the crime." *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010). The Michigan Supreme Court broke down the alternative elements of first-degree home invasion as follows:

> Element One: The defendant *either*:
>
> > 1. breaks and enters a dwelling or
> >
> > 2. enters a dwelling without permission.
>
> Element Two: The defendant *either*:
>
> > 1. intends when entering to commit a felony, larceny, or assault in the dwelling or
> >
> > 2. at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault.
>
> Element Three: While the defendant is entering, present in or, exiting the dwelling, *either*:
>
> > 1. the defendant is armed with a dangerous weapon or
> >
> > 2. another person is lawfully present in the dwelling. [*Id*. (emphases in original).]

In regard to the first element, MCL 750.110a(1)(a) defines the word "dwelling" as a "structure or shelter that is used permanently or temporarily as a place of abode, including an appurtenant structure attached to that structure or shelter." MCL 750.110a(1)(c) defines the phrase "without permission" as "without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling." Additionally, "[u]nder Michigan law, any amount of force used to open a door or window to enter the building, no matter how slight, is sufficient to constitute a breaking," but "[t]here is no breaking if the defendant had the right to enter the building." *People v Toole*, 227 Mich App 656, 659; 576 NW2d 441 (1998).

In this case, defendant argues that there was insufficient evidence to prove that he committed first-degree felony murder because there was insufficient evidence to prove that he

committed the underlying felony of first-degree home invasion. Defendant specifically argues that there was insufficient evidence to prove the first element of first-degree of home invasion because he was permitted to enter the property. However, there was sufficient evidence to prove that defendant did not have permission to enter the home the night of the victim's murder. See MCL 750.110a(1)(c).

While defendant argues and the record supports that the victim's mom and stepfather frequently allowed defendant into their home, it is clear from the record that defendant only was there for family-sanctioned events. The victim's mom testified that defendant came over approximately once a month for family get-togethers and that, starting two months before the victim was murdered, defendant came over on Wednesday nights for dinner. She stated that defendant always knocked before entering the home. These visits did not establish defendant's residency, lawful possession, or control of the property. Specifically defendant did not have permission to be at the property that night and defendant even testified at trial that after he entered the home, the victim seemed upset and asked him, "Why are you here?" NF also testified that he heard the victim in a panicked voice ask and tell defendant when he entered the home, "What are you doing? You can't be here." Therefore, the record indicates that there was sufficient evidence to establish the first element of first-degree home invasion.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Stephen L. Borrello