*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LARRY MADDIN, JR.,

        Defendant-Appellant.

UNPUBLISHED
April 20, 2023

No. 359933
Jackson Circuit Court
LC No. 17-005817-FC

Before: GADOLA, P.J., and PATEL and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right his convictions after a bench trial for first-degree premeditated murder, MCL 750.316(1)(a), and domestic violence, MCL 750.81(4). We affirm.

## I. FACTS

On December 10, 2017, defendant murdered Bobbie Jo Thomas. Defendant does not dispute that he killed Thomas, but disputes that his actions were premeditated. Thomas lived in a second-floor apartment in Jackson, Michigan. Thomas's friend, James Dentmond, lived less than two blocks from Thomas. Dentmond testified that he and Thomas had been best friends for 15 years. At 6:00 a.m. that day, Thomas came to his house saying that she needed to talk. Dentmond testified that it was unusual for Thomas to come to his house at that time of day, and that she appeared scared and frantic. She told him that the man she was in love with was at her apartment, that the man was jealous of another man, and that she was afraid that he was going to kill her. Dentmond urged Thomas to stay at his house, but after about 25 minutes Thomas left to get cigarettes, denying that she was going home. Thomas did not return.

Brenda Parrish lived in the apartment below Thomas and testified that defendant was Thomas's live-in boyfriend. On December 10, 2017, Parrish awoke when she heard loud footsteps near the entrance to Thomas's apartment, which was located above Parrish's bedroom. Parrish could hear yelling. When she opened her apartment door, she heard Thomas screaming: "No. Please don't. Stop." Parrish heard Thomas say, "I love you," three times, then say, "I love you, Larry. I love you." Parrish then heard a loud crash. She went back into her apartment, and shut and locked the door. The clock on her phone showed that it was 7:30 a.m. Parrish initially called

-1-

911, but changed her mind, and instead called her landlord who lived in the other downstairs apartment. The landlord told Parrish that he had not heard any noise. He then knocked on the door of Thomas's apartment. When he did not hear anything, he returned to his own apartment. The landlord later testified that defendant had been living with Thomas for about one month.

Defendant was on parole on December 10, 2017. His parole officer testified that defendant was reportedly living with Joyce Hathaway, a family friend, but defendant had requested to live with Thomas. Thomas also had expressed her desire for defendant to live with her, but the parole officer had not yet approved the living arrangement.

Joyce Hathaway lived approximately one block from Thomas's apartment. She testified that she was good friends with defendant's mother and considered defendant as her nephew. On the morning of December 10, 2017, defendant came to her home and asked her for a ride to the 145 Truck Stop; Hathaway testified that it was unusual for defendant to ask her for a ride that early in the morning. Hathaway also testified that she observed that defendant's eyes were "enormous." Hathaway told defendant no, then turned around to go back into her home assuming that defendant would follow. Defendant instead left, and Hathaway later noticed that a plastic bag was missing from her porch.

Marina Psychas, a registered nurse working at Henry Ford Allegiance Hospital less than one mile from Thomas's apartment, testified that defendant came to the emergency room between 7:30 a.m. and 8:00 a.m. on December 10, 2017. Defendant was sweaty, and had a large amount of blood on his clothing and his body. Defendant claimed that the Central Intelligence Agency (CIA) and Federal Bureau of Investigation (FBI) were chasing him. Defendant also claimed to have taken medications and threatened to harm himself. Another emergency-room nurse testified that defendant told her that CIA agents had come through the window to attack defendant and his girlfriend.

Dr. Brian Kim, the emergency-room doctor who treated defendant that day, testified that defendant was agitated and his heart rate was high. Defendant reported that the CIA had attacked him, and admitted to using cocaine, methamphetamine, and Tylenol. Dr. Kim noticed a large amount of blood on defendant, but defendant's only injury was a small scratch on his left index finger. Dr. Kim directed a nurse to notify law enforcement.

Officers responded to the hospital, then checked Thomas's apartment. When no one answered the door, Sergeant Timothy Hibbard forced open the door, which was deadbolted and barricaded from the inside with a chair. Sergeant Hibbard testified that he observed a "massive" amount of blood inside the apartment, and that the condition of the apartment indicated a "massive struggle." He found Thomas lying face down on the kitchen floor, dead. Sergeant Hibbard described the scene as the worst he had ever seen based on the amount of blood and the "clear violence." Detective Brett Stiles with the Jackson Police Department testified that there was a large amount of blood in the bedroom of Thomas's apartment, with blood on the bed and on the south wall. Detective Stiles believed that the amount of blood showed that the attack started in the bedroom and ended in the kitchen. Detective Stiles attended Thomas's autopsy; Thomas had been stabbed 27 times, with six wounds made to her legs postmortem.

Officer Peter Postma with the Jackson Police Department observed a ladder leaning against the back of the apartment building near a second-story window. Both the window and the ladder appeared covered in blood. Officer Scott Goings with the Jackson Police Department testified that he believed that the ladder was placed against the building before the recent snowfall because there was snow on the rungs. Officer Postma observed bloody footprints in the snow coming from the ladder and leading away from the residence. Officer Postma followed the footprints to Hathaway's home, where he observed blood on the storm door, the interior door, and on the front porch. Officer Postma followed the footprints to the rear parking lot of Henry Ford Allegiance Hospital. Detective Stiles searched along the route from Thomas's apartment to the hospital and discovered two white plastic bags with blood on them in a garbage can between the street and the sidewalk.

A bench trial was held on October 4 and October 5, 2021, during which the trial court admitted Dentmond's testimony concerning Thomas's statements as an excited utterance under MRE 803(2) over defendant's objection. At the conclusion of trial, the trial court found defendant guilty of first-degree premeditated murder. The trial court found that the evidence demonstrated defendant's premeditation and deliberation based upon the violence and extent of the attack as demonstrated by Thomas's numerous, severe wounds and the amount of blood and destruction in the apartment. The trial court also found defendant guilty of domestic violence. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without the possibility of parole for the first-degree murder conviction and 72 to 240 months' imprisonment for the domestic-violence conviction. Defendant now appeals.

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence presented at trial was insufficient to support a conviction of first-degree premeditated murder[1] because the evidence does not demonstrate premeditation or deliberation. We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Byczek*, 337 Mich App 173, 182; 976 NW2d 7 (2021). In doing so, we view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime had been demonstrated beyond a reasonable doubt. *Id*. We draw all reasonable inferences in support of the verdict. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018).

To prove first-degree premeditated murder, the prosecution must establish beyond a reasonable doubt a "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a); *Oros*, 502 Mich at 240. The elements of first-degree premeditated murder are (1) the intentional killing of a human being, with (2) premeditation and deliberation. *Id*. The elements of a crime may be established by circumstantial evidence and the reasonable inferences arising from that evidence. *People v Lymon*, ___ Mich

---

[1] Defendant does not challenge the trial court's finding that he killed Thomas, but only the finding that the killing was premeditated.

App ___, ___; ___ NW2d ___ (2022) (Docket No. 327355); slip op at 3. The distinction between first-degree and second-degree murder are premeditation and deliberation; those distinctions are questions of fact, and "minimum standards of proof, if reasonably related to the circumstances which must be proved, will serve to preserve the distinction between first-degree and second-degree murder." *Oros*, 502 Mich at 241 (quotation marks and citation omitted). The evidence sufficient to prove premeditation and deliberation varies from case to case; whether premeditation and deliberation are proven is determined by whether reasonable inferences drawn from the evidence support the verdict. *Id*. at 243-244.

To premeditate is "to think about beforehand" and to deliberate is "to measure and evaluate the major facets of a choice or problem." *Oros*, 502 Mich at 240 (quotation marks and citation omitted). Premeditation may be established through evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v Walker*, 330 Mich App 378, 384; 948 NW2d 122 (2019). Premeditation may be established "by circumstantial evidence tending to show that a defendant had an opportunity to think about, evaluate, or take a 'second look' at their actions." *Id*. at 383. There must be some time span between the initial homicidal intent and the ultimate action to establish premeditation and deliberation, "but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look," and the deliberation necessary to establish first-degree murder is not required to have existed for any particular time period before the killing. *Oros*, 502 Mich at 242-243. "It is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id*. at 242-243 (quotation marks and citation omitted).

In this case, there was sufficient evidence presented for a reasonable fact-finder to conclude based upon the circumstances of the killing itself that defendant premeditatedly and deliberately murdered Thomas. At 7:30 a.m., Thomas's neighbor heard yelling coming from Thomas's apartment, heard Thomas pleading for the attacker to stop, calling defendant by name and saying that she loved him, and then heard a loud crash. The autopsy revealed defensive wounds on Thomas's hands and left forearm, suggesting that Thomas fought her attacker. Police officers investigating the murder testified that the condition of Thomas's apartment indicated that there had been a violent and bloody struggle beginning in the bedroom and ending in the kitchen. During the attack, defendant stabbed Thomas 27 times; the wounds to her neck were especially severe, resulting in the exposure of her windpipe, C3 and C4 vertebrae, and the major blood vessels, massive bleeding, and soft tissue damage. Six wounds to Thomas's legs were inflicted postmortem.

Evidence of a struggle between the defendant and the victim is evidence of premeditation and deliberation. See *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999). In this case, the defendant's attack on Thomas was carried out during a period of time sufficient for defendant to pursue Thomas throughout the apartment stabbing her repeatedly while Thomas struggled and pleaded with him. The evidence thus demonstrated sufficient time to provide defendant opportunity to think about, evaluate, or take a second look at his actions.

Defendant argues that the number of stab wounds that the victim received is insufficient to establish premeditation and deliberation because "[t]he brutality of a killing does not itself justify an inference of premeditation and deliberation." *People v Hoffmeister*, 394 Mich 155, 159-160;

229 NW2d 305 (1975). The evidence presented, however, did not merely demonstrate that defendant inflicted severe wounds on Thomas; it also demonstrated a time span sufficient for defendant to carry out an extensive attack against a victim who was resisting him while traversing her entire apartment.

In addition, the circumstances that occurred before and after the murder suggest deliberation and premeditation. At 6:00 a.m. on the day of her murder, Thomas went to Dentmond's home and told him that she was afraid that the man she was in love with, who was at her apartment, was going to kill her, suggesting that defendant's conduct caused Thomas to fear that defendant intended to kill her. About one hour after Thomas left Dentmond's home, defendant stabbed Thomas to death in her apartment. After the attack, defendant left the apartment using a ladder that had been leaned against the apartment building near the bedroom window. An investigating police officer testified that the ladder had been placed there before the recent snowfall. Although the evidence did not establish that defendant placed the ladder against the building, defendant was aware of the ladder because he used it to flee the apartment after killing Thomas, suggesting that he planned his means of escape from the crime scene. Viewing the evidence in a light most favorable to the prosecution, a reasonable fact-finder could conclude that the evidence showed that defendant acted with premeditation and deliberation. See *Oros*, 502 Mich at 249. The trial court thus did not err by finding that the prosecution presented sufficient evidence to support a conviction of first-degree premediated murder.

## B. HEARSAY TESTIMONY

Defendant contends that the trial court erred by admitting James Dentmond's testimony regarding Thomas's statement to him an hour before her murder, which defendant argues was inadmissible hearsay. We disagree.

We review for an abuse of discretion the trial court's decision to admit or exclude evidence. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). We review de novo questions of law regarding the admission of evidence, such as the interpretation of a rule of evidence. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). A trial court abuses its discretion when its decision falls outside the range of principled outcomes, *Thorpe*, 504 Mich at 251-252, or when the admitted evidence is inadmissible as a matter of law. *Denson*, 500 Mich at 396. We will not find the trial court's decision on a close evidentiary question to be an abuse of discretion. *Thorpe*, 504 Mich at 252.

Dentmond testified that at 6:00 a.m. that day, Thomas told him that she feared defendant would kill her because he was jealous of another man. Dentmond described Thomas's demeanor as scared and frantic. At approximately 7:30 a.m., defendant killed Thomas in her apartment. At trial, defense counsel objected to Thomas's statements as hearsay. The prosecutor argued that the testimony was admissible under MRE 803(1) as a present sense impression, under MRE 803(2) as an excited utterance, and under MRE 803(3) as relevant to the victim's existing state of mind, emotions, and physical condition. Defense counsel offered no further argument, and the trial court admitted the statement under those hearsay exceptions. At the conclusion of trial and after the trial court's deliberation, the trial court stated that it considered Thomas's statement as an excited utterance under MRE 803(2), and also found that the statement admissible under MRE 804(b)(2) as a statement under belief of impending death.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is not admissible unless it falls within an exception to the hearsay rule. MRE 802; *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).

MRE 803(2) provides an exception for a hearsay statement that is an excited utterance, defined by that rule as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A statement qualifies as an excited utterance if the statement (1) arises from a startling event or condition, (2) is made before there is time for the declarant to contrive or misrepresent, and (3) relates to the circumstance of the startling event or condition. *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988). An excited utterance is deemed admissible because circumstances limit the possibility that the declarant had time to reflect and fabricate. *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998). There is no particular time limit for an excited utterance, though the passage of time is a relevant consideration when determining whether the declarant was under the stress of the startling event. *Id*. The trial court has broad discretion to determine whether a declarant was under the stress of the event or condition at the time the statement was made. *Id*. at 552.

We conclude that the trial court did not abuse its discretion by determining that Thomas's statement to Dentmond was an excited utterance. Thomas's statement (1) arose from the startling condition that she perceived that defendant was inclined to kill her, (2) was made to Dentmond apparently soon after leaving defendant at her apartment (she lived near Dentmond and arrived at his house at 6:00 a.m. stating that man in question was at her apartment), and (3) the statement related to the circumstance of the startling condition, i.e., that defendant wanted to kill her. We also conclude that even if Thomas's statement were inadmissible, the admission of her statement would not be sufficient error to reverse defendant's conviction. As discussed, there was ample evidence from the circumstances of the crime itself to support a finding of premeditation, without Thomas's statement. Any alleged error in the admission of Thomas's statement would not result in a miscarriage of justice, and therefore would not be sufficient to disturb the judgment. See MCL 769.26; *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (Evidentiary error does not merit reversal in a criminal case unless it appears "more probable than not that the error was outcome determinative").

## C. 180-DAY RULE

Defendant also contends that the trial court erred by denying his motion to dismiss the charges because the delay in commencing his trial violated the 180-day rule. We disagree.

We review a trial court's ruling on a motion to dismiss for an abuse of discretion, which occurs when the trial court's decision falls outside the range of principled outcomes. *People v Nicholson*, 297 Mich App 191, 196; 822 NW2d 284 (2012). The trial court's "attributions of delay are reviewed for clear error." *People v Witkoski*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 355299); slip op at 2.

MCL 780.131(1), referred to as the 180-day rule, provides:

Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

Relatedly, MCL 780.133 provides:

In the event that, within the time limitation set forth in [MCL 780.131], action is not commenced on the matter for which request for disposition was made, no court of this state shall any longer have jurisdiction thereof, nor shall the untried warrant, indictment, information or complaint be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

The purpose of the 180-day rule[2] is to "dispose of new criminal charges against inmates in Michigan correctional facilities; the rule requires dismissal of the case if the prosecution fails to commence action on charges pending against an inmate within 180 days after the [Department] delivers notice of the inmate's imprisonment." *People v Lown*, 488 Mich 242, 246; 794 NW2d 9 (2011). The rule, however, does not require that a trial be commenced or completed within 180 days of the date the notice was delivered. *Id.* Rather, "it is sufficient that the prosecutor proceed promptly and move the case to the point of readiness for trial within the 180-day period." *Id.* (quotation marks omitted). The requirement that the prosecutor proceed in good faith means that the prosecutor "must commence action and cannot satisfy the rule by taking preliminary steps without an ongoing genuine intent to promptly proceed to trial." *Id.*

[T]he relevant question is not whether 180 days of delay . . . may be attributed to the prosecutor, but whether the action was commenced within 180 calendar days following the date the prosecutor received the notice. If so, the rule has been satisfied unless the prosecutor's initial steps are followed by inexcusable delay beyond the 180-day period and an evident intent not to bring the case to trial

---

[2] The 180-day rule is distinct from a defendant's constitutional right to a speedy trial in a criminal matter, US Const, Am VI; Const 1963, art 1, § 20, which is not at issue in this case.

promptly. *Witkoski*, ___ Mich App at ____; slip op at 3 (quotation marks and citation omitted).

In this case, there is nothing in the record indicating that the prosecutor's initial steps of timely initiating the case were followed by "inexcusable delay beyond the 180-day period and an evident intent not to bring the case to trial promptly." *Id.* At the time the MDOC sent the 180-day notice on August 27, 2020, defendant's trial was scheduled for December 7, 2020, within the 180-day period. The trial thereafter was rescheduled twice because of COVID-19 pandemic-related restrictions on jury trials. The 180-day period expired February 23, 2021. On April 16, 2021, defendant asked for an adjournment to consider a bench trial, and defense counsel specifically stated that defendant was "not pressing for a quick trial." Defendant requested a bench trial on May 18, 2021, agreed to a trial date of September 20, 2021, which later apparently was rescheduled to October 4, 2021. The record thus shows that the delay between August 27, 2020 and February 23, 2021, was attributable to the suspension of jury trials because of the COVID-19 pandemic.[3] See *id*. at __; slip op at 3-4 (holding that delay caused by the suspension of jury trials because of the pandemic did not violate the 180-day rule). The prosecution was ready for trial in December 2020 and in March 2021; there was no inexcusable delay on the part of the prosecution, and the trial court therefore properly concluded that there was no violation of the 180-day rule. See *id*. at __; slip op at 3-4.

Affirmed.

/s/ Michael F. Gadola
/s/ Sima G. Patel
/s/ Allie Greenleaf Maldonado

---

[3] Defendant argues that the pandemic was not the reason for the delay in this case because the trial court could have held a jury trial after certain restrictions were lifted. The trial court found that Jackson County courts were unable to conduct jury trials from October 28, 2020 through June 7, 2021, because they did not meet the requirements of Phase 3 under the Michigan Supreme Court's Administrative Order No. 2020-14, 505 Mich cxlix (2020), which directed trial courts to follow a phased approach to return to normal operations based upon specific criteria. Under Administrative Order No. 2020-19, 505 Mich clxviii (2020), from June 26, 2020 through July 25, 2021, courts not at Phase 3 could conduct jury trials only upon approval from the State Court Administrative Office, which defendant did not demonstrate occurred in this case. Accordingly, defendant's trial was delayed on the basis of COVID-19-related protocols.