*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 3, 2021

Plaintiff-Appellee,

v

No. 350452
Kalamazoo Circuit Court

NATHAN LEON BRANHAM,

LC No. 2018-001812-FC

Defendant-Appellant.

Before: SWARTZLE, P.J., and MARKEY and TUKEL, JJ.

PER CURIAM.

Defendant was convicted, after a jury trial, of first-degree premeditated murder and manufacturing marijuana. Regarding the murder charge, defendant claimed self-defense, arguing that the intruder whom he struck with a baseball bat had acted in a crazed manner because of the amount of methamphetamine in his system. The jury rejected the defense of self-defense and convicted defendant of both first-degree premeditated murder and manufacturing marijuana. Defendant appeals his murder conviction, which we affirm.

## I. BACKGROUND

This case arises from the victim's death during the course of his apparent attempt to steal marijuana plants from defendant's yard. A struggle ensued between defendant and the would-be thief; defendant repeatedly punched the intruder and struck him several times with a baseball bat. The intruder suffered blunt-force trauma to the head, and he died a few days later. Defendant admitted that he had punched the victim repeatedly in the face and that he had struck the victim with a baseball bat, but claimed that he had acted in self-defense.

## A. THE POLICE INVESTIGATION

At trial, David Malek testified that he lived near defendant's home. Malek recalled that, in the early-morning hours of September 30, 2018, he was outside on his back deck when he heard a "screetch" or "scream" that lasted about 15 seconds. Malek could not identify the source of the sound; he did not know whether the sound was made by an animal or a human, and he did not hear any words, but he felt that the sound indicated "something in distress." Malek admitted that he

-1-

did not see anyone getting assaulted, but he knew that the sound was "out of the ordinary." Although Malek testified that he heard the sound at about 12:30 or 1:00 a.m., the prosecutor impeached Malek's testimony with his earlier statement to police that he heard the sound at approximately 2:30 or 3:00 a.m.

Defendant's uncle, John Allegretti, testified that he received a phone call from defendant on September 30, 2018, at 3:19 a.m. Allegretti testified that he heard "[a] lot of yelling, commotion, screaming"; he heard defendant saying "motherfucker"; and he heard defendant's wife saying "stop, stop, Nathan." Allegretti recalled that he "just kept saying Nathan, Nathan," but the line hung up; he testified that no conversation occurred during the call. Because Allegretti believed that defendant and his wife were fighting, he got dressed and traveled to defendant's house, which was about one mile away. Arriving at defendant's house 10 to 15 minutes after the phone call, Allegretti saw a man "right next to the side door" of defendant's house, "laying in kind of a fetal position but on his knees . . . and he was moaning." Allegretti saw defendant "standing maybe a few feet away" from the injured man. Defendant was "standing there with a baseball bat," wearing only "[b]oxer shorts and a robe." Allegretti testified that he looked at defendant and said, "what the fuck, what the fuck, Nathan?" Defendant "just kinda stared at [him] for a minute," and then defendant said, "I'm getting sick." Allegretti did not attempt to touch the man lying on the ground, but he said "hey dude, dude, can you hear me, to that effect and he was just moaning and he didn't give me no response." Allegretti told defendant to call the police, and then he left the scene because he "didn't want to be a part of it." On cross-examination, Allegretti admitted that he did not know the man lying on the ground, he did not witness an assault, and he did not know who had assaulted whom first.

Sergeant Michael White of the Kalamazoo Township Police Department (KTPD) testified that he was dispatched to defendant's house at about 3:40 a.m. on September 30, 2018. When he arrived, Sergeant White found the victim "lying on the ground facing face up very near the doorway" of defendant's house. He noticed immediately that the victim was injured and bleeding profusely. Sergeant White also stated that, at first glance, it looked to him like the victim's body had been "staged" near the door to defendant's house because "he was lying on his back with his legs straight out." Sergeant White explained:

> [H]aving 34 years of experience and unfortunately been involved in several homicides, it's very unusual for somebody to have suffered this type of traumatic injury being—finding them lying on their back with their legs straight out and only their left arm slightly bent. I felt something significant had transpired here but the way that the body was lying at the time didn't give deference [sic] to what might have happened.

Sergeant White testified that he spoke with defendant, who was "very upset, he was very excited, his eyes were wide, he was talking very quickly," and defendant pointed him to a wooden baseball bat. Sergeant White also testified that, when defendant met him at the door, defendant "was wearing undershorts and his entire hair and body were wet as if he had gotten into a bath or a shower." Sergeant White asked defendant why he was wet, and defendant said he had an illness that "causes him to throw up so given this situation, he began to throw up and the only way to calm that illness or sickness was to quickly take a bath."

Later that day, after police obtained a search warrant for the property, Sergeant White entered the backyard of defendant's home. Inside a wooden-stockade fence, he found two chain-link dog kennels that contained marijuana plants. Sergeant White observed that one of the dog kennels had been entered, and that a marijuana plant inside that dog kennel was "all broken down as if something had fallen into it." Sergeant White also observed "a large amount of blood" near the marijuana plant, and he concluded that an assault had occurred in that location.

Sergeant White admitted that he did not ask defendant whether the victim had been in possession of a weapon. Although he did not remember seeing any wire cutters on the night of the incident, Sergeant White admitted that a pair of wire cutters was found by another police officer, inside the dog kennel. In addition, police found a work glove inside a dog kennel that matched a work glove that was on the victim's body when police arrived. After the victim was transported to the hospital for medical treatment, police officers inventoried the victim's clothing, and discovered that he had a knife in his pocket.

KTPD Detective Jeff Jerzyk testified that he received a call at 4:20 a.m. on September 30, 2018, and was asked to draft an application for a search warrant for defendant's house so that police could search for any evidence related to the incident. Detective Jerzyk testified that, once police obtained the search warrant, they found that defendant's backyard contained a "pretty typical outdoor marijuana grow" operation, that an enclosed porch of defendant's house contained a "processing room" where marijuana was dried, and that police found locations in the house containing an "indoor grow room" and a "cloning and vegetation room." The parties stipulated to the admission of a lab report concluding that samples of plant materials taken from defendant's house tested positive as marijuana.

After the prosecutor completed his questioning of Detective Jerzyk, during a conference at the bench (which was presumably inaudible to the jury, and some of which was not captured in the transcript), defense counsel complained to the trial court that the prosecutor was portraying defendant as "a drug dealing murderer protecting his drug operation." After some discussion at the bench about the applicable marijuana laws, defense counsel stated that he would "stipulate" to the marijuana charge. The trial court told defense counsel that he could cross-examine Detective Jerzyk as he wished, but expressed an opinion that defense counsel's proposed line of questioning regarding marijuana-user cards was "very, very dangerous," and that it might backfire.

After the bench conference concluded, defense counsel then proceeded to cross-examine Detective Jerzyk, who admitted that defendant had a medical-marijuana card that allowed him to possess 12 marijuana plants. The detective also testified that he was only asked to "explain the basics of an indoor marijuana and an outdoor marijuana grow," and that he was making no connection between the growing of marijuana and the murder charge. On redirect examination, Detective Jerzyk stated that defendant was not in compliance with the Michigan Medical Marijuana Act on the date in question.

Michigan State Police Detective Lieutenant Jeff Crump testified that he arrived at defendant's home at about 6:55 a.m. on the date of the incident, and that he performed crime-scene-investigation duties. Detective Lieutenant Crump was informed that the home contained a marijuana-grow operation and that the homeowner had beaten someone using a baseball bat. He

took photographs of the baseball bat, and he noticed that there was "blood all around it towards the end of the bat." Other than the bat, he found no weapons at the scene.

Detective Lieutenant Crump testified that he looked around for things that might be pertinent to his investigation. He observed a motion detector on top of the backyard fence. In addition, he noted that "there were other motion detectors on the inside of the fenced area that you can't see from the outside." Those motion detectors were all trained on the location where the marijuana was growing. He did not see any cameras.

Inside the backyard fence, the detective saw two separate areas that were fenced in with chain-link fence. The gate to one of those areas was still locked, but the gate to the other area was open. Inside the open gate, he observed "a substantial amount of blood" near the base of a broken-down marijuana plant. In addition, he found blood on a post located next to the broken plant, and that blood was about 3 or 4 feet off the ground. The detective observed a glove next to the gate of the dog kennel, as well as a baseball cap, a lighter, and a pair of wire cutters. Next to the door of defendant's home, he found some clothing, a bloody towel, and a small pool of blood. In addition, he observed a trail of blood along the south side of the house that led to the spot where he found the clothing and towel. The detective admitted that did not see any drag marks, but stated that the grass and the recent rain might have prevented him from seeing that type of evidence.

KTPD Officer Brandon Hambright testified that he was called to defendant's home and assigned to canvass the neighborhood. He testified that he talked to Malek, who stated that he had heard a noise, when he was sitting on his back porch, at about 2:30 a.m. Officer Hambright later went to the police station to take photographs of defendant; he noticed that defendant had slight scratches on both of his forearms, a scratch on his foot, redness around his neck, and knuckles that were swollen slightly. After defendant was interviewed by other officers, Officer Hambright allowed defendant to use the bathroom. According to Officer Hambright, while defendant was in the bathroom, "he was talking and he indicated that he didn't want to hurt the man, he just wanted to teach him a lesson." Officer Hambright admitted that he did not ask defendant whether the victim had been in possession of a weapon.

KTPD Detective Georrgeann Ergang testified that she arrived at defendant's house after the victim had been transported to the hospital. She met with defendant and his wife inside their house, and asked defendant to come down to the police department to speak with her. Defendant agreed to do so, and he went to the police department voluntarily. According to Detective Ergang, defendant stated that he had a medical-marijuana card, that he grew marijuana in his backyard for his own consumption, and that he "sometimes would sell to family and friends."

According to Detective Ergang, defendant stated that his wife had noticed that "someone had tampered with the backyard marijuana grow about a week prior" to the incident. Defendant gave the detective consent to search his cell phone, and she found text messages indicating that defendant was selling marijuana. Defendant told her that he had called 911 earlier that day. Detective Ergang's search of defendant's cell phone indicated that he had called Allegretti before he called 911; the phone call to Allegretti lasted 29 seconds, and the phone call to 911 lasted over six minutes.

According to Detective Ergang, defendant stated that he did not know if the victim had either a gun or a knife. Although the interview lasted for almost two hours, defendant never made any statement indicating that he believed that the victim had a weapon. At the time of the interview, the detective was unaware that a knife had been found in the victim's pocket. From her subsequent review of reports prepared by other officers, Detective Ergang learned that police retrieved from the victim's clothing a lighter, a wallet, some change, and a silver knife. The knife was closed and located in the victim's pocket.

According to the detective, during the interview, defendant described the victim's stature and age, and "talked about how he overpowered him and he was stronger than" the victim. The trial court admitted into evidence a portion of the interview recording. The prosecutor played that portion of the recording for the jury, and it was transcribed into the record. In the recording, the detective asked defendant if the victim had landed any "really good hits" anywhere on defendant's body. Defendant stated that the victim did not and that "he really didn't have a chance to, I was holding on to him, you know, so I was overpowering him so much." Defendant also stated that he was "a really strong guy" and stated, "I'm very powerful so that dude had no chance; as little as he was, he had no chance." Defendant further explained that the victim had "tried to rush me, you know, he tried to get me hooked but he couldn't, there was no way. He was just too little." Defendant also denied that he was bleeding from any injuries sustained during the fight with the victim.

On cross-examination, defense counsel attempted to question Detective Ergang regarding other statements that defendant made during the interview. The prosecutor objected on hearsay grounds. The trial court sustained the objection, but noted that defense counsel had the right to play the recording of the entire interview for the jury, if he wished to do so. Defense counsel stated that he had not reviewed the recording in a while but requested a recess to do so before the parties excused the detective as a witness. The trial court stated that defense counsel could review the recording over the jury's lunch break. After the jury left the courtroom, the trial court again reminded defense counsel that if he "wanted to put in the entirety of the tape, that can be played." And, after the prosecutor's witnesses finished for the day, at a bench conference, the trial court told defense counsel, "I know you do have the opportunity to play the tape or call a witness out of order, if you'd like, I would allow that." Defense counsel stated that he would wait until the next day to provide defendant's proofs. After the jury left the courtroom, the trial court and defense counsel placed the following on the record:

> *The Court*: . . . The jury's left the courtroom. Do you want to put on the record that I met with counsel in chambers before the break, after the lunch break and then I called counsel to the bench for a bench conference outside of the hearing of the jury before I let them go. We had talked about perhaps taking the defense witness or having the defense play the entire recording as an exhibit in the presence of the jury for them.
>
> It's my understanding [defense counsel] that you thought about this, consulted with others, you decided that you were not going to play the entire interview, is that correct?
>
> [*Defense Counsel*]: That's correct.

*The Court*:  All right.  But you were afforded an opportunity to do that if you desired?

[*Defense Counsel*]:  I was.

## B.  DEFENDANT'S PROPOSED EXPERT WITNESS

Outside of the jury's presence, the trial court addressed the prosecutor's motion regarding the testimony of defendant's proposed expert witness, Dr. Dennis Simpson.  The trial court noted that the prosecutor had served defendant with a discovery request regarding any expert witness who might be called to testify by the defense.  The discovery request addressed the disclosure of the curriculum vitae of any such witness, as well as a written description of the substance of the expert's proposed testimony.  The trial court stated that defense counsel did not timely respond to the discovery request, but on either the day of trial or the day before that, defense counsel had notified the prosecutor that he intended to call Dr. Simpson as an expert witness and indicated that Dr. Simpson would testify regarding the effects of methamphetamine on the human body.  The trial court found that defense counsel had failed to provide the witness information in a timely fashion, as required by MCR 6.201(a) and MCL 767.94a(1).  Therefore, the trial court granted the prosecutor's motion and prohibited defendant from calling Dr. Simpson as a witness.

## C.  THE MEDICAL EXAMINER

On the final day of trial, the prosecutor called Dr. Elizabeth Douglas, the deputy medical examiner for Kalamazoo County, and the trial court qualified her as an expert in forensic pathology.  Dr. Douglas testified that she performed the autopsy on the victim.  Based on her examination, she concluded that the victim had suffered "multiple blunt force injuries" and "lethal head trauma."  In her opinion, the "manner of death" was homicide.  Dr. Douglas stated that the victim's injuries included abrasions and contusions on his leg, an abraded contusion on his right lower abdomen, a contusion on his lower back near the right hip, a rib fracture, an abrasion and contusion on the midline chin, a laceration above the left eyebrow, a fracture of the right jaw and left cheekbone, a laceration to the back of the head, and a depressed fracture of the skull.  Dr. Douglas opined that the facial fractures and the skull fracture were caused by separate impacts, and she concluded that the victim suffered either four or five separate blows to the head.  Dr. Douglas testified that, after receiving these types of blows to the head, a victim "might still be conscious but I would imagine they would be seeing stars and probably a little dazed if they were conscious at all."  She testified that, after receiving even one of these blows to the head, the victim "would not be terribly effective at doing much of anything."  Dr. Douglas singled out the depressed fracture of the skull, describing it as a "significant injury" that "extended into the base of the skull," and concluded that this injury took "a lot of force" to inflict.  She further testified that "head wounds bleed a lot so I would expect that there would be a fair amount of blood loss associated with" that injury.

According to Dr. Douglas, the toxicology report revealed that the victim's blood contained 249 nanograms per milliliter of methamphetamine.  When the prosecutor asked whether she was able to describe what impact this amount of methamphetamine would have had on the victim, Dr. Douglas stated:

So drug toxicity is a little bit of a tricky thing. Toxicity is a combination of an individual's vulnerabilities and tolerances and the level of drugs. So it's hard for me to look at one value and say this level of 249 nonograms per mil [sic] will always produce these features in everybody; it just sort of depends on how experienced a user somebody is. And there are a lot of idiosyncrasies to it so no, I can't say much about it other than it was there.

On cross-examination, defense counsel inquired further about the amount of methamphetamine in the victim's system. Dr. Douglas admitted that there was a "significant" amount of methamphetamine in the victim's system, but stated that interpreting the impact of the drug on the victim's actions was "a little bit tricky" because it involved "an interplay between individual vulnerability and the level of drugs." She stated that "all meth is bad meth" because "there's no safe level for it." She admitted that methamphetamine was a stimulant and that stimulants affect different individuals in different ways. She also admitted that "people can exert very impressive levels of strength when they're under the influence" of methamphetamine, including "superhuman feats" of strength. As Dr. Douglas testified:

> [*Defense Counsel*]: All right. What I'm asking you is if I'm hitting a guy that's—I'm in a fight with a guy and he's propped up on meth, the blow that you testified to that would cause one of those injuries may not have the same effect on him as it would a sober person? So in other words, if I hit a guy propped up on meth, it might not affect him the same way as it affects a sober person, correct?

> [*Dr. Douglas*]: I think that's fair.

> [*Defense Counsel*]: Okay. And it might not slow him down as much as it would a sober person, correct?

> [*Dr. Douglas*]: I think that's fair as well.

> [*Defense Counsel*]: And he could continue to fight more than a sober person, correct?

> [*Dr. Douglas*]: For some of those injuries, yes. The one where there's fractures into the base of the skull, probably not.

> \* \* \*

> [*Defense Counsel*]: —to a lay person that's in a fight with a guy that's propped up on meth, do you think there'd be any—any visual difference, in other words, like that something is propping this guy up, I'm hitting him and he's not going down?

> [*Dr. Douglas*]: Yeah, in [sic] so in cases of excited delirium, that is—that's been reported so yeah, people seem—will sometimes, yeah, keep going when they should have been felled by an injury, they can stay up—

> [*Defense Counsel*]: All right.

-7-

[*Dr. Douglas*]: —in some contexts.

On redirect examination, Dr. Douglas testified that "no methamphetamine is good methamphetamine. And it may be somebody is okay with it one day and then they're tweaking the next day. I can't really say." The prosecutor also clarified Dr. Douglas's testimony as follows:

> [*The Prosecutor*]: Doctor, you said—again, back you [sic] answered that some of [defense counsel's] questions that it's possible that say someone would notice that this person that someone on meth would appear crazed and appear very different. Also possible that they wouldn't appear any different at all?
>
> [*Dr. Douglas*]: They might just appear agitated as opposed to very erratic. There's a spectrum of behavior and I don't know where [the victim] fell on that.
>
> [*The Prosecutor*]: So he could be anywhere from just a little off to like you said crazed—
>
> [*Dr. Douglas*]: Or at least psychotic, yeah, I don't know where he was.

Finally, on recross examination by defense counsel, Dr. Douglas admitted that the "best evidence" of how the victim was impacted by the methamphetamine in his system would be the observations from someone who personally saw how the victim was acting on the night of the assault.

## D. DEFENDANT'S TESTIMONY

After the prosecutor rested his case, defendant testified in his own defense. Defendant explained that he was 28 years old, and that he lived with his wife, son, and mother-in-law. On the night in question, his wife was present with him in the home, along with their 16-month-old son and his two nieces. Defendant recalled going to bed for the night between 11:00 p.m. and midnight, and stated that he, his wife, and his son were all sharing a bedroom that night.

Defendant testified that he was a "light sleeper" and that he was awakened by a noise. Although he admitted that he had installed motion sensors in his backyard, he denied that he was awakened by the sensors that night; he stated that it was raining, and that "the motion sensors usually are defective when it's raining." When he woke up, defendant was wearing only boxer shorts. Defendant testified that, after checking on his nieces to see that they were still asleep, he allowed his dog to go outside. When he opened the exterior door to let the dog out, he noticed that the backyard gate was open. When he walked over to the backyard gate, he noticed that the door to one of the dog kennels was open, about six or seven feet away from the backyard gate. Believing that a deer might have entered the dog kennel to eat his marijuana plants, defendant went to investigate:

> And so I go in there, I walk about five feet into the kennel and a guy jumps up and it scared the hell out of me, excuse my language, scared the hell out of me and I jumped and said what the fuck. And this guy says I didn't steal nothing. And then suddenly attacks me, just jumps right on me, starts swinging. And I notice something in his hand, I wasn't for sure what it was, it might have been a knife or a gun, I just seen a little shine to it.

Defendant claimed that he grabbed the intruder's hand that contained the potential weapon, and that he started punching the intruder in the face as hard as he could. Defendant testified that he was "scared as hell" and that the intruder "just kept struggling with me and would not go down. He was screaming things like I'll kill you, bitch, fuck you, things of that nature."

Defendant testified that he and the intruder "ended up on the ground for a second," and that defendant put his knee into the intruder's ribs "very hard." Defendant continued:

> And then I got up to walk out of the kennel and he jumps on my back and puts me in a headlock. I then grab his arm and kind of maneuver out of the headlock and when I did that, I grabbed, you know, I had a hold of his arms.
>
> And my wife suddenly appeared in the kennel and was whacking him with a baseball bat. And she roughly hit him, I don't know, about two to five times. So as she was hitting him, he would not go down. He like had some superhuman strength or you know something like that, he was psychotic, very psycho, very psychotic. He would not go down.

Defendant admitted that he was "bigger than the guy," and that he was "stronger than him," but denied that he was overpowering the intruder, stating that he could not get the intruder to stop. Defendant claimed that, because the intruder "wouldn't go down while my wife was hitting him . . . I reached to grab the bat from my wife." Defendant testified that he instructed his wife "to go back to the house" because he was worried about his son.

Defendant testified that, as he took the baseball bat from his wife, the victim slipped out of his hands and grabbed a green stake that was propping up one of defendant's marijuana plants. Defendant testified that he hit the intruder "in the head and arms" with the baseball bat, and that he saw the victim drop to his knees. Defendant stated that "I remember swinging as hard as I could," hitting the intruder in the jaw and causing the intruder to fall onto one of the plants. Defendant claimed that he then began to walk away "to get a phone," and the victim walked out of the fenced backyard, "started stumbling," and then fell to his knees, while moaning and groaning.

Defendant testified that his wife brought him a cell phone and that he called Allegretti to "see what to do." Contrary to his uncle's testimony, defendant claimed that he asked Allegretti to come to his house. Defendant testified that the intruder started to get up, and that defendant pushed him down with his foot. According to defendant, his wife screamed at him to stop, "thinking, you know, I was hurting him or something." Defendant testified that he told his wife, "I'm holding him down so he don't fucking go in the house." Defendant also testified that he had lost his glasses during the altercation with the intruder, and that he instructed his wife to watch the intruder while he looked for his glasses. Defendant recalled that he walked back to the dog kennel and grabbed both his glasses and the baseball bat, and then returned to the side door of the house.

Defendant stated that Allegretti arrived at his house shortly thereafter, and recalled that he was feeling nauseous when Allegretti arrived. Defendant explained that he suffers from "cyclic vomiting syndrome" that causes him to vomit violently if he lacks sleep, suddenly wakes up, or his adrenaline pumps too much. According to defendant, he told Allegretti that he did not know

what to do and that he was starting to get sick, and Allegretti told him to call the police. Defendant testified that he got in the shower to prevent himself from vomiting, and that he called 911 "from inside the shower."

Defendant denied knowledge of who had burglarized his marijuana operation the prior week, and denied having any idea that an intruder was going to burglarize him that night. Defendant also denied taking a weapon with him when he went out to his backyard, and claimed that he was "suddenly" and "violently attacked." Defendant stated that he was protecting his family and himself. Defendant testified that he was worried that if the intruder got past him, the intruder would get to his wife and child, and that "there was no telling what this guy would do." Defendant reiterated that he was stronger than the intruder, and agreed that the intruder "should have stayed down" when defendant hit him.

On cross-examination, defendant admitted that he never told the 911 operator, Sergeant White, Officer Hambright, or Detective Ergang that the intruder had a weapon, had threatened to kill him, had jumped on his back, had put him in a headlock, or had grabbed a plant stake. Defendant admitted that he gave a voluntary interview to Detective Ergang. When asked if he told the detective that the victim said, "I'm going to kill you, bitch," defendant testified that he might have told the detective that the intruder was "throwing verbal threats." Defendant denied ever saying that he wanted to teach the intruder a lesson, and denied telling police that the alarm on the motion sensors woke him up that night. On redirect examination, defendant testified that none of the police officers he spoke with on the night of the assault asked him if the intruder had a weapon. Further, defendant insisted that he was suddenly and violently attacked when he went outside to look at his dog kennel and that a burglar jumped on him.

### E. JURY INSTRUCTIONS AND CLOSING ARGUMENTS

After the defense rested, and outside the presence of the jury, the trial court explained that the prosecutor and defense counsel had met with him in chambers to discuss the jury instructions:

> [*The Court*]: Thank you. I want to place on the record that I met, after I allowed the jury to go to lunch, with the lawyers in chambers. We preliminarily discussed jury instructions. The lawyers went to lunch.
>
> We came back; I was presented with new jury instructions that comported mostly with what we talked about. I then worked with the lawyers in chambers; we crafted about three—or corrected about three or four jury instructions to comport with the facts of the case. It's my understanding that the packet of jury instructions as it currently exists meets with the satisfactions of both of the parties, is that correct?
>
> [*The Prosecutor*]: That's correct, you're [sic] Honor.
>
> [*Defense Counsel*]: It is, your Honor.

[*The Court*]: All right. And I will give you both an opportunity as—after I have read those into the record and to the jury to object or ask for additions, deletions or corrections.

The focus of defense counsel's closing argument was the doctrine of self-defense. Defense counsel told the jury that this case presented "one of the clearest cut cases of self-defense I've ever seen." Defense counsel argued that defendant was "at home sleeping with his wife and toddler when he's suddenly confronted with a violent act in his boxer shorts and rain." Defense counsel also reminded the jury of Dr. Douglas's testimony that a person who has methamphetamine in their system can appear to have "superhuman strength" and can "act very psychotic." Defense counsel continued:

> I asked her the last question, who would be in the best position to testify as to how the person was acting? The person who was observing it. Who is the only person in this room that observed [the victim] acting the way he was? That guy [defendant], at 3:30 in the morning in his boxer shorts, that guy.

\* \* \*

> You'll have the toxicology report, you'll have the pathologist's report, study it, remember her testimony. She's got no dog in this fight. I didn't put those words in her mouth, she came up with them. Superhuman strength, psychotic behavior, that's what this guy was exhibiting when he was burglarizing my client's home.

After closing arguments, the trial court then read to the jury the instructions that both the prosecutor and defense counsel had approved. As pertinent to the issues raised on appeal, the trial court instructed the jury regarding the defense of self-defense, as follows:

> The defendant claims that he acted in lawful self-defense. A person has the right to use force or even take a life to defend himself under certain circumstances. If a person acts in lawful self-defense, that person's actions are justified and he is not guilty of murder or voluntary manslaughter.
>
> You should consider all the evidence and use the following rules to decide whether the defendant acted in lawful self-defense. Remember to judge the defendant's conduct according to how the circumstances appeared to him at the time he acted.
>
> First, at the time he acted, the defendant must have honestly and reasonably believed that *he was in danger of being killed*. If the defendant's belief was honest and reasonable, he could act immediately to defend himself even if it turned out later that he was wrong about how much danger he was in. In deciding if the defendant's belief was honest and reasonable, you should consider all the circumstances as they appeared to the defendant at the time.
>
> Second, a person may not kill or seriously injure another person just to protect himself against what seems like a threat of only minor injury. The defendant

-11-

*must have been afraid of death*. When you decide if the defendant was afraid of one or more of these, you should consider all the circumstances: the condition of the people involved, including their relative strength, whether the person [sic] the other person was armed with a dangerous weapon or had some other means of injuring the defendant, the nature of the other person's attack or threat, whether the defendant knew about any previous violent acts or threats made by the other person.

Third, at the time he acted, the defendant must have honestly and reasonably believed that what he did was immediately necessary. Under the law, a person may only use as much force as he thinks is necessary at the time to protect himself. When you decide whether the amount of force used seems necessary, you may consider whether the defendant knew about any other ways of protecting himself but you may also consider how the excitement of the moment affected the choice the defendant made.

A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense.

However, a person is never required to retreat if attacked in his own home, nor if the person reasonably believes that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden, fierce, and violent attack.

Further, a person is not required to retreat if the person: has not or is not engaged in the commission of a crime at the time the deadly force is used, and has legal right to be where the person is at that time, and has an honest and reasonable belief that the use of deadly force is *necessary to prevent imminent death, great bodily harm or sexual-assault of the person or another*.

The defendant does not have to prove that he acted in self-defense. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense. [Emphasis added.]

After it finished reading the jury instructions, the trial court inquired of the prosecutor and defense counsel whether they had any requests for "additions, deletions, [or] corrections of anything that was read," and defense counsel answered, "No, your Honor."

The jury convicted defendant of first-degree premediated murder, MCL 750.316, and manufacturing marijuana, MCL 333.74012. On the murder conviction, the trial court sentenced defendant to life in prison, without the possibility of parole. On the marijuana conviction, the trial court sentenced defendant to 316 days in jail, with credit for 316 days served.

F. POST-TRIAL PROCEEDINGS

After sentencing, defendant filed a motion in the trial court seeking a new trial and a directed verdict of acquittal based on ineffective assistance of counsel, prosecutorial misconduct,

and the quantum of evidence regarding premeditation and deliberation. Defendant argued that his trial counsel had rendered ineffective assistance when he (1) failed to object to allegedly improper arguments from the prosecutor during opening and closing arguments, (2) failed to object to allegedly improper jury instructions regarding self-defense, (3) failed to file timely notice of defendant's proposed expert witness, and (4) failed to elicit exculpatory evidence. The trial court denied the motion in a written opinion.

The trial court concluded that the prosecutor made no improper arguments in his opening or closing arguments, that the jury instructions regarding self-defense were not erroneous, and that the failure of defendant's trial counsel's to object to those items did not constitute deficient performance. The trial court also concluded that the failure of defendant's trial counsel to disclose the expert witness in a timely manner did not cause defendant prejudice because the proposed expert's testimony would have been "corroborative at best" with the testimony presented by defendant and Dr. Douglas. Finally, the trial court concluded that defendant's trial counsel did not perform deficiently when he failed to elicit testimony regarding defendant's purchase of surveillance cameras because the desired evidence was not exculpatory and because trial counsel's failure to include it was a tactical decision.

Regarding the jury instruction on the issue of self-defense, the trial court stated as follows:

> Defendant argues that this Court gave an improper jury instruction regarding self-defense. Self-defense is defined as an individual who has not or is not engaged in the commission of a crime, at the time he or she uses deadly force against another individual, when the individual honestly and reasonably believes that the use of the deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another. MCL 780.972(1). This Court's instructions to the jury stated that the Defendant must have been afraid of death. While the self-defense statute allows for deadly force when defending against imminent death, serious injury, or sexual assault, only the relevant theories of self-defense need to be utilized.
>
> As it would have been improper for this Court to instruct the jury of deadly forced [sic] used in self-defense against sexual assault, it was also improper for it to include self-defense against serious injury. Defendant's theory of defense was that the victim's intention was to kill Defendant. Defendant states that the victim said "I'll kill you," and "things of that nature." The Court found this specific instruction to be more accurate given the defense's theory. See *People v Richardson*, 490 Mich 115, 119-120 (2011) (stating that trial judges should not hesitate to modify or disregard the criminal jury instructions when presented with a clearer or more accurate instruction).
>
> Furthermore, these instructions are reviewed in its [sic] entirety. *People v Clark*, 274 Mich App 248, 255 (2007). When read in its entirety, the Court also notes that the jury was instructed that a person is not required to retreat if the person "has an honest and reasonable belief that the use of deadly force is necessary to prevent imminent death, great bodily harm or sexual assault of the person or another." If the Court erred in specifically tailoring Criminal Jury Instruction 7.15,

Use of Deadly Force in Self-Defense, to refer to only the fear of imminent death, then the Court at least supplemented this potential error in its additional jury instructions to properly comport with all statutory requirements of MCL 780.972(1). For that reason, this Court also finds that trial counsel was not ineffective for not objecting to these jury instructions, as this Court does not find the jury instructions improper.

After the trial court denied his motion for a new trial and a directed verdict of acquittal, defendant, *in propria persona*, moved this Court to remand this case for a *Ginther* hearing regarding his claims of ineffective assistance of counsel. In that motion, defendant raised substantially the same arguments that he had raised in the trial court in his post-trial motions. This Court denied the motion to remand. *People v Branham*, unpublished order of the Court of Appeals, entered October 6, 2020 (Docket No. 350452).

Defendant now appeals his murder conviction to this Court; defendant does not challenge his marijuana-related conviction.

## II. ANALYSIS

On appeal, defendant raises multiple arguments through counsel. Defendant argues that the trial court erroneously instructed the jury regarding self-defense and that it abused its discretion when it denied his motion for a new trial because the jury instructions regarding the defense of self-defense did not include the words "seriously injured," but only used the word "death." Defendant also argues that his trial counsel was ineffective in multiple ways, and that the prosecutor committed misconduct that denied defendant a fair trial because he misrepresented evidence to the jury and made flagrantly improper arguments. Finally, defendant argues that the evidence was insufficient to submit the case to the jury and was insufficient to sustain a conviction because the prosecutor failed to disprove the defense of self-defense beyond a reasonable doubt and because the conviction was against the great weight of the evidence.

In addition, defendant raises several issues in his Standard 4 brief. Defendant argues that the trial court impermissibly excluded an expert witness as a sanction for a discovery violation, that the evidence presented by the prosecutor was insufficient to support his conviction, that his conviction was against the great weight of the evidence, and that his trial counsel rendered ineffective assistance of counsel because he failed to perform any pretrial investigation or interview witnesses, and failed to mount any type of defense.

## A. JURY INSTRUCTIONS

Defendant first argues that the trial court erroneously instructed the jury regarding self-defense. Defendant points to the trial court's instructions that, to act in lawful self-defense, a defendant "must have honestly and reasonably believed that he was in danger of being killed" and that a defendant may not kill or seriously injure another person to protect himself against minor injury, but "must have been afraid of death." Defendant argues that the trial court should have instructed the jury that he acted in lawful self-defense if he honestly and reasonably believed that he was in danger of "imminent great bodily harm" and that the failure to give the jury this instruction deprived him of a fair trial.

-14-

Waiver is "the intentional relinquishment or abandonment of a known right," *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) (cleaned up), and "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error," *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (cleaned up). Accordingly, when counsel goes beyond simply failing to object to a jury instruction, and "affirmatively approves a jury instruction," he waives any error. *People v Hershey*, 303 Mich App 330, 349; 844 NW2d 127 (2013) (cleaned up). "[T]here are no 'magic words' that constitute a waiver"; rather, "waiver analysis should consider the entire context of a defendant's conduct concerning a purportedly waived issue to determine whether the defendant, in fact, intentionally relinquished a known right." *Id.* at 350.

In this case, before either the prosecutor or defendant's trial counsel presented their closing arguments, the trial court indicated that it had discussed the jury instructions with counsel in chambers, and defendant's trial counsel expressed satisfaction with the instructions as drafted. Both the prosecutor and defendant's trial counsel, however, discussed the jury instructions regarding self-defense in their closing arguments, and both of their arguments seem to indicate that they believed the trial court would instruct the jury that whether defendant acted in self-defense hinged on whether defendant reasonably believed that he was in danger of being killed, seriously injured, or sexually assaulted. The trial court's written opinion denying defendant's motion for a new trial also appears to suggest that the trial court may have altered the agreed-upon instruction regarding self-defense after the prosecutor and defense counsel had approved it. Nonetheless, the record reflects that, when the trial court finished reciting the final jury instructions and asked the parties if they had requests for corrections, defense counsel said, "No, your Honor." Because this statement expressed satisfaction with the instructions as read, we conclude that defendant has waived appellate review of the alleged instructional error. See *Kowalski*, 489 Mich at 503. This Court "has consistently held that an affirmative statement that there are no objections to the jury instructions constitutes express approval of the instructions, thereby waiving review of any error on appeal." *Hershey*, 303 Mich App at 351. Given that defendant has raised a claim that his trial counsel was ineffective for failing to object to the self-defense instruction given, we will nonetheless analyze the propriety of the instruction given, as required for resolution of the ineffective-assistance claim.

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of principled outcomes. *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016).

Because a "defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him," the "trial court's role is to clearly present the case to the jury and to instruct it on the applicable law." *Dobek*, 274 Mich App at 82. "Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence." *Id.* "If supported by the evidence, defendant's theory of the case must be given." *People v Rajput*, 505 Mich 7, 10; 949 NW2d 32 (2020) (cleaned up). "Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Dobek*, 274 Mich App at 82.

The Michigan Legislature codified the defense of self-defense as follows:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. . . . [MCL 780.972(1)(a).]

"[O]nce a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of disproving the affirmative defense of self-defense beyond a reasonable doubt." *Rajput*, 505 Mich at 11.

The model jury instruction regarding the use of deadly force in self-defense, M Crim JI 7.15, provides optional language. As appropriate to the facts of a case, the instruction may read that, "at the time he acted, the defendant must have honestly and reasonably believed that he was in danger of being killed," or the word "killed" may be replaced with the words "seriously injured" or "sexually assaulted." Furthermore, the instruction may read that the defendant "must have been afraid of death," or the word "death" may be replaced with the words "serious physical injury" or "sexual assault." Mich Crim JI 7.15.

In this case, defendant filed a motion for a new trial in the trial court, citing this issue regarding the self-defense instructions. The trial court denied the motion for a new trial, reasoning that the instructions given were appropriate because defendant testified that the victim said "I'll kill you" and "things of that nature." Therefore, the trial court reasoned that defendant's theory of self-defense was that he was attempting to protect himself from threat of imminent death, not from threat of imminent great bodily harm. We note defendant's testimony that he was "suddenly" and "violently attacked," that he thought the attacker might have had a weapon in his hand, that the attacker was "very psychotic" and was exhibiting "superhuman strength," and that there was "no telling what this guy would do." Defense counsel stressed this testimony in his argument to the jury. Based on this testimony, the trial court's determination that the instruction given was applicable to the facts of the case was not an abuse of discretion. See *March*, 499 Mich at 397. And defendant fails to demonstrate that the instruction resulted in a miscarriage of justice. See *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). The trial court included the "bodily harm" language in its instruction regarding the duty to retreat, and it instructed the jury that the prosecutor must prove beyond a reasonable doubt that defendant did not act in self-defense. When reviewed in their entirety, even if imperfect, the instructions represented the issues to be tried and sufficiently protected the defendant's rights. See *People v Clark*, 274 Mich App 248, 255; 732 NW2d 605 (2007).

## B. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecutor committed misconduct when he misrepresented evidence and made improper arguments during his opening statement and closing argument.

Because defense counsel did not object to the prosecutor's statements at trial, this issue is unpreserved. *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999); *People v Gibbs*, 299 Mich App 473, 482; 830 NW2d 821 (2013).

To resolve a claim of prosecutorial misconduct, this Court examines whether a prosecutor's remarks prejudiced a defendant's trial by examining the whole record and evaluating the prosecutor's conduct in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). "The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury." *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987). "Generally, prosecutors are accorded great latitude regarding their arguments, and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

Defendant objects to the prosecutor's comments, made during his opening statement, that defendant beat the victim to death with a baseball bat, that he "snuck up on him and he ambushed him," and that he did so because he wanted to teach the victim a lesson. Defendant also objects to the prosecutor's suggestion that defendant "staged the body" after the assault ended. Defendant further objects to the prosecutor's comments, made during his closing argument, that defendant wanted to "teach somebody a lesson" and that he had installed motion sensors, but not cameras, in his backyard.

We conclude that the prosecutor's challenged comments constituted reasonable interferences from the evidence, not misconduct. Defendant told a police witness that "he just wanted to teach [the victim] a lesson." Using defendant's own words cannot be construed to be an unreasonable inference. With respect to staging, the prosecutor presented evidence from which the jury could have inferred that the victim had suffered his fatal injury—the fracture to the base of his skull—in the dog kennel, where a large amount of blood was found. The prosecutor also presented evidence through Dr. Douglas that the victim likely would have been unable to move under his own power after suffering that skull fracture. Yet, a trail of blood led from the dog kennel to the location where the victim's body was discovered, at the door to defendant's house. Although defendant argues that there was no evidence that the victim was dragged, Sergeant White testified that, drawing on his experience, it appeared to him that the victim's body had been staged because he was lying on his back, with his legs straight out. The prosecutor's use of Sergeant White's opinion was within the scope of reasonable interference.

The prosecutor's statements in regard to defendant's planning and the motion detectors and cameras also constituted reasonable inferences from the evidence. The evidence indicated that, approximately one week before the night in question, defendant became aware that someone had trespassed onto his property. When police officers investigated the scene, they found motion sensors that could only be seen, and would only alert, if a person entered the enclosed area in which the marijuana plants were located. Therefore, it was reasonable for the prosecutor to infer that defendant set up the motion sensors in response to the earlier trespass to protect his marijuana operation and to teach the next trespasser a lesson. Moreover, it is unclear why defendant's argument that he purchased security cameras but had not installed them because the Internet was out the day before the altercation would help his argument. If anything, this assertion seemingly makes the prosecutor's inference as to the motion sensors more reasonable because it suggests that

-17-

the security equipment was new and was purchased in response to the earlier trespass. Accordingly, the prosecutor did not commit prosecutorial misconduct.

## C. EXCLUSION OF EXPERT-WITNESS TESTIMONY

Defendant argues, in his Standard 4 brief, that the trial court abused its discretion when it excluded Dr. Dennis Simpson's expert testimony. This Court reviews for an abuse of discretion a trial court's decision to admit expert testimony. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). "A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013) (cleaned up).

Although a defendant "has a constitutionally guaranteed right to present a defense, which includes the right to call witnesses," this right is not absolute. *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008). A defendant must comply with established rules of procedure and evidence. *Id*. MCL 767.94a requires the defense to make certain disclosures no later than 10 days before trial. Among those disclosures is the curriculum vitae of a testifying expert and either a report or written description of the expert's proposed testimony. MCR 6.201(A)(3). In this case, defense counsel did not provide the prosecutor with Dr. Simpson's curriculum vitae and a report or written description of his proposed testimony within the required time period. Therefore, on the first day of trial, the trial court properly granted the prosecution's motion to exclude Dr. Simpson's testimony.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

We now turn to five arguments that defendant's trial counsel was ineffective—four raised by defense counsel and one by defendant in his Standard 4 brief. Each argument lacks merit.

> Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. [*People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004) (cleaned up).]

"To establish ineffective assistance of counsel, defendant must prove that counsel's deficient performance denied him the Sixth Amendment right to counsel and that, but for counsel's errors, the proceedings would have resulted differently." *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Although "[c]ounsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process," a reviewing "court must indulge a strong presumption" that counsel's challenged action was "sound trial strategy." *Strickland*, 466 US at 688-689. "Judicial scrutiny of counsel's performance must

be highly deferential." *Id*. at 689. A reviewing court must affirmatively entertain the range of possible reasons for a counsel's actions. *Cullen v Pinholster*, 563 US 170, 196; 131 S Ct 1388; 179 L Ed 2d 557 (2011).

Defendant argues that his trial counsel was ineffective for failing to object to the comments, discussed earlier, that the prosecutor made during his opening statement and closing argument. Defendant's argument lacks merit. Defendant fails to demonstrate that his trial counsel's failure to object to the challenged comments was not sound trial strategy or that it was prejudicial. See *Strickland*, 466 US at 688-689. An objection could have drawn further attention to the prosecutor's comments. Moreover, as we discussed earlier, the prosecutor's challenged statements constituted reasonable interferences, and therefore, were not improper. See *Seals*, 285 Mich App at 22.

Defendant also argues that defense counsel was ineffective because he failed to object to the jury instruction regarding self-defense. As explained above, the trial court's instructions fairly represented the issues and sufficiently protected defendant's rights. See *Clark*, 274 Mich App at 255. Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Defense counsel's failure to object to the self-defense instructions did not constitute deficient performance.

Next, defendant argues that defense counsel was ineffective because he did not comply with discovery rules that required him to provide the subject matter of proposed expert testimony to the prosecutor, which led to the exclusion of Dr. Simpson's testimony. Defendant's argument fails because defense counsel's performance was not prejudicial. See *Dixon*, 263 Mich App at 396. Defendant's trial counsel effectively cross-examined Dr. Douglas regarding the methamphetamine found in the victim's body and the potential effects of that drug on the victim's behavior. Defendant's trial counsel elicited expert testimony that "people can exert very impressive levels of strength when they're under the influence" of methamphetamine, including "superhuman feats" of strength, and that individuals under the influence of the drug can appear to be "psychotic." Importantly, Dr. Douglas admitted that the "best evidence" of how the victim was impacted by the methamphetamine in his system would be the observations from someone who personally saw how the victim was acting on the night of the assault. Defendant's trial counsel stressed this testimony in his closing argument, noting that only defendant personally saw how the victim was acting. Defendant has not shown that his proffered expert witness would have offered different testimony on this issue, or testimony that would have been more favorable to defendant. Rather, the proposed testimony of defendant's proffered expert would have been cumulative to the testimony provided by Dr. Douglas. Defendant therefore fails to demonstrate a reasonable probability that the outcome of the trial would have been different but for counsel's failure to properly present Dr. Simpson's testimony. See *Dixon*, 263 Mich App at 396.

Defendant also argues that his trial counsel rendered ineffective assistance because he failed to prepare for trial. Specifically, defendant highlights his trial counsel's statement that he had not watched for some time defendant's recorded interview with law enforcement. Defendant's argument lacks merit. Although defendant's trial counsel admitted that he had not watched defendant's recorded interview recently, he requested additional time to watch the interview. The trial court not only granted that request, but invited defendant's trial counsel to play the entire

recording for the jury. Defendant's trial counsel considered the issue, and for what appear to be sound tactical reasons, decided not to play the entire recording for the jury. Given defendant's boasting to Detective Ergang regarding how strong he was, how he was "bigger than the guy," how he significantly overpowered the victim, who was a "little guy" who "didn't have a chance" against defendant, and given defendant's testimony that he struck the victim with as much force as he possibly could, playing the entire recording for the jury could have focused the jury's attention on evidence that would have been harmful to defendant's case.

Defendant also argues that his trial counsel should have presented evidence (apparently, through defendant's recorded interview) that defendant had purchased cameras for his property and should have used this fact to object to the prosecutor's closing argument. As the trial court reasoned in its opinion denying defendant's motion for a new trial, there are a myriad of strategic reasons why defendant's trial counsel could have declined to elicit testimony regarding the cameras. The record includes testimony that defendant knew about trespassers a week before the incident with the victim, yet defendant's reason regarding why the cameras were not set up was only that the Internet was out the day before the altercation. Focusing on these facts could have caused the jury to further question defendant's motives in setting up the motion sensors (but not the cameras) and his actions on the night in question. Therefore, defendant has failed to demonstrate that failure to elicit this testimony constituted deficient performance.

In his Standard 4 brief, defendant argues that defense counsel was ineffective because he failed to interview defendant's grandmother-in-law, Margaret L. McNally, who supposedly owned the house in which defendant lived, and who possessed a baseball-bat collection. Defendant also argues that defense counsel failed to explain to the jury that McNally owned several of the marijuana plants. Defendant further alleges that defense counsel failed to investigate cyclic vomiting syndrome. Defendant fails to demonstrate that, even cumulatively, these additional pieces of information, if admissible, would have had a reasonable probability of altering the outcome of the trial. See *Dixon*, 263 Mich App at 396. None of these additional pieces of information would have aided the jury in determining whether defendant premediated the killing of the victim. The facts that defendant took a shower after the struggle, got sick after the struggle, and had a ready supply of baseball bats does not negate the prosecutor's argument that defendant premediated his attack on the next person who entered his marijuana-grow operation. And the facts promoted by defendant, even if true, do not negate the reasonable inference that "the lesson" defendant said he wanted to teach the victim included killing him.[1]

---

[1] Defendant also argues that the trial court abused its discretion when it denied his motion for an evidentiary hearing on ineffective assistance of counsel. Defendant contends that factual issues exist regarding whether his trial counsel acted strategically or negligently. The trial court denied the motion on the basis that defendant failed to establish that defense counsel's performance was prejudicial. Defendant does not address this basis. Moreover, for the reasons discussed earlier, the available record provided sufficient detail for the trial court to conclude that defense counsel's performance, even if deficient, did not affect the outcome of the proceedings. Accordingly, defendant fails to demonstrate that the trial court abused its discretion when it declined to hold an evidentiary hearing. See *Unger*, 278 Mich App at 216-217.

## E. SUFFICIENCY AND GREAT WEIGHT

Next, defendant argues, both in his brief filed by counsel and in his Standard 4 brief, that the prosecutor presented insufficient evidence to support his first-degree murder conviction and that this conviction is against the great weight of the evidence. Specifically, defendant argues that the prosecutor presented no evidence of premeditation and that the prosecutor did not disprove defendant's claim of self-defense. On the same basis, defendant argues that the trial court abused its discretion when it denied his motion for a directed verdict of acquittal.

## 1. SUFFICIENCY OF THE EVIDENCE

Due process requires that a conviction is supported by "sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Johnson*, 460 Mich 720, 722-723; 597 NW2d 73 (1999) (cleaned up). This Court reviews a sufficiency of the evidence claim de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

> [W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. [*People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).]

Appellate courts do not hear testimony of witnesses and, therefore, defer to the jury's credibility determinations. *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *Id*.

This Court reviews for an abuse of discretion the trial court's grant or denial of the motion for a new trial. *People v DeLisle*, 202 Mich App 658, 661; 509 NW2d 885 (1993). "An appellate court will review a properly preserved great-weight issue by deciding whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011).

To obtain a conviction of first-degree premediated murder, the prosecutor must prove beyond a reasonable doubt that the defendant committed a "willful, deliberate, and premeditated killing." MCL 750.316(1)(a). There is no specific time requirement sufficient to establish premeditation. *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). Instead, "sufficient time must have elapsed to allow the defendant to take a 'second look.' " *Id*. (citations omitted).

Based on our review of the record, a rational fact-finder could have readily concluded that the prosecutor presented sufficient evidence of premeditation. See *Johnson*, 460 Mich at 722-723; see also *Plummer*, 229 Mich App at 300-301. The prosecutor presented testimony that defendant learned, about a week before the incident, that someone was stealing his marijuana. He set up motion sensors that could alert him to the presence of an intruder. Defendant stated that he "wanted to teach [the victim] a lesson." Defendant is asking this Court to judge the credibility of his claim

that he did not want to "hurt the guy." Defendant's argument that the prosecutor failed to disprove self-defense asks this Court to do the same. Juries are allowed to reach reasonable inferences, and this Court must view the evidence in the light most favorable to the prosecutor. Viewing this evidence in the light most favorable to the prosecutor, the jury could have reasonably concluded that defendant killed the victim with premeditation. Therefore, defendant's argument as to the sufficiency of the evidence fails.

## 2. GREAT WEIGHT OF THE EVIDENCE

Defendant's great-weight argument likewise lacks merit. Unlike a challenge to the sufficiency of the evidence, a claim that the verdict was against the great weight of the evidence is not a constitutional claim. *People v Roper*, 286 Mich App 77, 83-84; 777 NW2d 483 (2009). A court reviewing whether a verdict was against the great weight of the evidence is required to review the whole body of proofs. *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993). A reviewing court may only substitute its view regarding witness credibility for that of the jury under exceptional circumstances: if witness testimony contradicts indisputable physical facts or laws, is patently incredible, defies physical realities, is so implausible that it could not be believed by a reasonable juror, or was so far impeached that it was deprived of all probative value. *People v Lemmon*, 456 Mich 625, 642-644; 576 NW2d 129 (1998). A reviewing court may not function as a thirteenth juror. *Id*. at 647. "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *Unger*, 278 Mich App at 232 (2008) (cleaned up).

Defendant's argument is simply that the great weight of the evidence weighs heavily against defendant's first-degree murder conviction. This case does not equate with one of the scenarios described in *Lemmon* that would allow this Court to overturn a verdict on the basis of credibility. See *Lemmon*, 456 Mich at 642-644. Therefore, defendant's argument fails.[2] Because defendant's conviction was supported by sufficient evidence and was not against the great weight of the evidence, the trial court's denial of defendant's motion for directed verdict was a principled outcome. See *March*, 499 Mich at 397. There is no indication (and defendant does not argue) that the jury's verdict was more likely the result of causes outside the record. Additionally, the record reasonably supported the jury's verdict. See *Lacalamita*, 286 Mich App at 469. Specifically, the prosecutor presented testimony that defendant installed the motion sensors to protect his marijuana operation and wanted to teach the victim a lesson. Therefore, defendant's argument fails.

---

[2] For the first time, in his Standard 4 brief, defendant maintains that McNally owned the home and some of the marijuana plants. Defendant also maintains McNally had a lifelong obsession with baseball bats. These facts are not part of the record. And, even if they were, defendant simply asks this Court to make credibility judgments that we cannot make. See *Henderson*, 306 Mich App at 9.

## 3. MOTION FOR A DIRECTED VERDICT

Finally, we conclude that the trial court did not abuse its discretion when it denied defendant's motion for a directed verdict. "Due process commands a directed verdict of acquittal when 'sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt' . . . is lacking." *Lemmon*, 465 Mich at 634-634 (citations omitted). The evidence presented before the motion is made must be viewed in the light most favorable to the prosecutor. *Id*. at 634. Again, the prosecutor presented evidence that defendant knew about a previous trespass, that defendant installed motion sensors that only alerted him to someone trespassing on his marijuana operation, and that defendant told a police officer that he wanting to teach the victim a lesson. Viewed in the light most favorable to the prosecutor, the trial court's determination that the prosecutor presented sufficient evidence of premeditation was a principled outcome. See *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997).

Affirmed.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Jonathan Tukel